JOHN N. DANIGGELIS, Plaintiff and Counterdefendant-Appellee, v. DAVID PIVAN *et al.*, Defendants-Appellants (David Pivan *et al.*, Counterplaintiffs-Appellants; John N. Daniggelis *et al.*, Counterdefendants-Appellees).

First District (4th Division)   No. 86—0794

Opinion filed August 20, 1987.

Robert Radasevich, of Lurie, Sklar & Simon, Ltd., of Chicago, for appellants.

Richard E. Steck, of Steck and Schofield, of Chicago, for appellee John N. Daniggelis.

JUSTICE JOHNSON delivered the opinion of the court:

This proceeding arises from the jury trial of three breach of contract actions which were consolidated in the circuit court of Cook County. The underlying theme of these actions is five notes which evidenced the capitalization of a business venture for the purchase and resale of discount airline coupons. The first action was brought by plaintiff-counterdefendant John N. Daniggelis (hereinafter Daniggelis) against defendants-counterplaintiffs David Pivan and Lawrence Wilson (hereinafter Pivan and Wilson) alleging breach of an oral agreement to establish a formal escrow account to hold the coupons pledged as collateral for the loans. Thereafter, Pivan and counterplaintiffs Rita Pivan and Pivan Management Co. (hereinafter Rita Pivan and PMC) filed a complaint against Daniggelis and his company, Airline Coupon Services, Inc. (hereinafter ACS), seeking damages for amounts remaining due and owing under a collateral note and a promissory note. Lastly, Wilson and counterplaintiffs Earl Abramson and Irving Finder (hereinafter Abramson and Finder) brought another action against Daniggelis and his company seeking damages for amounts owing on the three remaining collateral notes. The court consolidated all of the actions for trial. The jury found in favor of Daniggelis and against all other parties on each of the claims and awarded him damages of $21,400. The court entered judgment on the verdict plus costs. This appeal followed.

We affirm in part and reverse in part and remand.

The stipulated statement of facts reveals that Daniggelis originally contacted Pivan in late June or early July 1979, to obtain financing for a new business venture. For the previous several weeks, he had purchased half-fare airline discount coupons issued by American and United Airlines from passengers as they left their flights, and sold them at a profit. He informed Pivan of his plan to purchase large quantities of coupons to sell to mass users in bulk at a substantial markup. Pivan agreed to lend him money to finance the venture and contacted his friend and occasional business associate, Wilson, to tell

him of the proposition.

On July 5, 1979, Daniggelis secured a loan from Pivan evidenced by a collateral note to Rita Pivan in the principal amount of $15,000, with an 18%-per-annum rate of interest, due on September 4, 1979 (hereinafter referred to as the first Pivan note), and pledged 500 coupons as collateral for the loan. In connection with this note Daniggelis also signed a promissory note for management fees to PMC (hereinafter referred to as the first PMC note) in the amount of $1,860, with no interest, which was due on the same date.

On July 6, 1979, Daniggelis secured from Pivan a second loan for the same amount and with the same conditions. Again the loan was evidenced by a collateral note (hereinafter the second Pivan note) to Rita Pivan and another 500 coupons were pledged as collateral. The due date on this note was September 25, 1979. Similarly, Daniggelis executed a second promissory note for management fees to PMC in the amount of $2,490, dated July 6, 1979, and due September 25, 1979, with no interest (hereinafter the second PMC note).

Daniggelis met with Pivan and Wilson on July 11, 1979, and executed a third collateral note to Wilson (hereinafter the Wilson note) in the principal amount of $12,000, with interest at the stated rate of 100% per annum, due in 90 days, and pledged 300 coupons as collateral. With Wilson acting as agent, Daniggelis executed two more collateral notes bearing the same terms and conditions as the Wilson note. The first of these was payable to Finder (hereinafter the Finder note) and executed on July 13, 1979. The other was payable to Abramson (hereinafter the Abramson note) and executed on July 23, 1979. Daniggelis pledged 300 coupons as collateral on each of these notes as well.

On August 21, 1979, Daniggelis delivered a check for $18,000, which represented his sale of the 500 coupons collateralizing the first Pivan note at $36 per coupon. At that time, Wilson signed a receipt to Daniggelis indicating that the first Pivan note and the first PMC note were retired and returned $675 to Daniggelis as his profit.

On September 25, 1979, the second Pivan note and second PMC note became due. Daniggelis claimed that his efforts to sell the coupons were inhibited by Pivan's and Wilson's failure to set up the escrow account. Thereafter, on October 6, 1979, Daniggelis asked for and received the release of 100 of the 500 coupons collateralizing the second Pivan note. It was agreed that he would bring in payment for the released coupons on or before October 13, 1979, and that the due date for payment on the remaining 400 coupons would be extended until October 16, 1979. However, Daniggelis returned 83 of the 100

released coupons on October 16, 1979, and kept the remaining 17 coupons.

On October 9, 11, and 18, 1979, the Wilson, Finder, and Abramson notes, respectively, became due. No payments had been made on or before the due dates of these notes. Both Wilson and Pivan notified Daniggelis that the notes were in default and stated that the coupons would be sold if payment was not made within 3 days.

Prior to receiving these letters, Daniggelis had responded to a solicitation from the General Service Administration (hereinafter the GSA) for the purchase of coupons by the Federal government. Pursuant to a confirmation of an award dated October 15, 1979, Daniggelis was entitled to submit 1,000 United Airline coupons to the GSA and would be paid $46 per coupon for every coupon used or lost by the Federal government. Daniggelis presented the confirmation to Pivan and Wilson on October 16, 1979, and requested the release of 1,000 coupons to tender to the GSA. Pivan and Wilson refused, claiming that the confirmation of award was not a "buy-sell" contract and fearing the risk of leaving nearly all of the coupons in the hands of the GSA for the 30 days they believed were required under the confirmation. Wilson further testified on cross-examination that under the terms of the award, they could have forced the government to act within 15 days.

On October 26, 1979, 53 coupons were released to Daniggelis to sell to various branches of the State of Illinois. None of the parties testified as to the whereabouts of these coupons or the funds they represent.

Following the due date on the last note and the expiration of the three-day notice period set forth in their letter, Pivan and Wilson undertook to execute upon their collateral and sell the coupons remaining in their possession to various purchasers. In total, Pivan and Wilson testified that they received $39,030 for the 1,274 coupons they sold. However, at trial they produced none of the purchase orders for these transactions. Furthermore, they could not account for all of the coupons received from Daniggelis.

On November 2, 1979, Daniggelis received a second confirmation of award from GSA for 1,500 American Airline coupons at $46 per coupon, containing the same terms as the first award. Pivan and Wilson released no coupons to Daniggelis in response to this award.

Prior to receiving the second confirmation of award from the GSA, Daniggelis sought a temporary restraining order to prevent Pivan and Wilson from selling any coupons remaining in their possession. The chancery division of the circuit court of Cook County

granted the motion on October 31, 1979, and on November 1, 1979, Daniggelis filed an amended complaint for injunctive relief. The claim was transferred on April 8, 1980, to the law division of the circuit court of Cook County because Pivan and Wilson alleged to have sold all of the coupons in their possession on or before October 31, 1979.

Complaints were filed against Daniggelis and his company, ACS, by Pivan, PMC, and Rita Pivan on December 10, 1979, and by Wilson, Abramson, and Finder on March 28, 1980. The actions were consolidated on October 13, 1983, pursuant to a stipulation between the parties. The court denied the motion of defendants-counterplaintiffs and counterplaintiffs for a directed verdict on liability and reserved ruling on the issue of damages. At the close of all the evidence, the court denied the renewed motion for a directed verdict on the damages issue and allowed the case to go to jury. The jury found in favor of Daniggelis on all claims and awarded damages in the amount of $21,400. Counterplaintiffs and defendants-counterplaintiffs appeal raising three issues for review: (1) whether the jury's verdict in favor of Daniggelis on his claim against Pivan and Wilson was against the manifest weight of the evidence; (2) whether the jury's verdict against Pivan, Rita Pivan, PMC, Wilson, Abramson, and Finder on their claims against Daniggelis and ACS was against the manifest weight of the evidence; and (3) whether the award of damages to Daniggelis in the amount of $21,400 was against the manifest weight of the evidence, improperly based on bias, prejudice, speculation and conjecture.

I

Pivan and Wilson contend that the jury's verdict in favor of Daniggelis on his action against them should be set aside as being against the manifest weight of the evidence. They argue that insufficient evidence was presented to support the jury's determination that the parties entered into an agreement to establish an escrow account which would release coupons in exchange for a contract with a creditworthy buyer. In the alternative, they urge that, even if such an agreement is found, the preponderance of the evidence did not establish that Daniggelis was damaged by their breach because he never presented them with a creditworthy buyer.

■ Verdicts and judgments are only considered against the manifest weight of the evidence where a conclusion opposite to that reached by the jury is clearly evident or the jury's verdict is palpably erroneous. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 27, 377 N.E.2d 572, 575-76.) "Manifest weight" has been defined as that weight

which is clearly evident, plain and indisputable. (61 Ill. App. 3d 22, 27, 377 N.E.2d 572, 575-76.) Where there is a conflict of testimony, it is the function of the jury to resolve the controverted issues of fact by determining the credibility of the witnesses and the weight to be accorded their testimony. "[A] reviewing court may not substitute its judgment for that of the jury in passing on the weight of the evidence [or] on the credibility of the witnesses." *Barth v. Board of Education* (1986), 141 Ill. App. 3d 266, 275, 490 N.E.2d 77, 83.

The evidence reveals that the receipts for the coupons signed by both Pivan and Wilson and held as collateral on these loans indicated that the coupons would be deposited in an escrow account for safekeeping. Daniggelis testified that he initially told Pivan that his business plan required an escrow through which the money and coupons would flow and that he repeatedly insisted that the escrow be established. He envisioned the escrow account's operation as insulating his ability to deliver the coupons to creditworthy purchasers without requiring the purchasers to provide cash or cash equivalents in advance of delivery. Daniggelis further testified that without the escrow, sales to large institutions would be cumbersome and virtually impossible. Pivan and Wilson testified that they remembered several discussions about an escrow, could not remember why Daniggelis wanted an escrow and never understood the purpose of the escrow. Later, they also testified that the loans were not contingent on the formation of the escrow account. They understood that the escrow would only release coupons to Daniggelis in exchange for cash. No formal escrow account was ever established.

█ We find that the evidence presented was sufficient to justify the verdict of the jury. The action was tried as a single lawsuit. The testimony of Daniggelis, if believed by the jury, could be used as a basis to amply sustain the verdict of the jury. Even where we may have reached a contrary conclusion on the evidence presented, we would not substitute our judgment for that of the jury. Thus, the verdict of the jury was not against the manifest weight of the evidence.

## II

Counterplaintiffs (Pivan, Rita Pivan, PMC, Wilson, Abramson, and Finder) contend next that the manifest weight of the evidence does not support the jury's verdict in favor of Daniggelis on their counterclaims against him and his company, ACS. They argue that the documentary and testimonial evidence presented at trial clearly established that Daniggelis defaulted on the notes owing to them, that the secured parties had the right to and did execute on the collateral in a

commercially reasonable manner, and that a deficiency remained. Our research indicates that the answer to this contention lies in the laws of agency and contract.

■ The undisputed facts of the instant case reveal that Rita Pivan, PMC, Abramson, and Finder entered into their individual finance agreements with Daniggelis through an agent, either Pivan or Wilson. The authority of these agents is uncontested. The long-established rule, enunciated by our supreme court in *Taylor v. Taylor* (1858), 20 Ill. 650, is that all the acts of an agent performed within the scope of his agency bind the principal and are regarded as the principal's own acts. (20 Ill. 650, 652.) Applying this rule to the instant case, we reach the conclusion that Rita Pivan and PMC are bound by the acts of Pivan (their agent), and Abramson and Finder are bound by the acts of Wilson (their agent).

■ As discussed in the previous argument, the manifest weight of the evidence supports the jury's determination that Pivan and Wilson committed the initial breach of the underlying contract with Daniggelis. It is also a well-established general rule that "a party to a contract who commits the first breach of its terms cannot maintain an action for a subsequent breach by the other party." (*Kosuga v. Kelly* (7th Cir. 1958), 257 F.2d 48, 56; see also *Morris v. Wibaux* (1895), 159 Ill. 627, 43 N.E. 837; *Fryison v. McGee* (1982), 106 Ill. App. 3d 537, 436 N.E.2d 12; *Godare v. Sterline Steel Casting Co.* (1981), 103 Ill. App. 3d 46, 430 N.E.2d 620.) The facts of this case present no reason for us to depart from this general rule. See *Printpack, Inc. v. Container Technologies, Inc.* (1984), 124 Ill. App. 3d 568, 464 N.E.2d 298.

## III

■ The final issue raised by defendants-counterplaintiffs and counterplaintiffs is whether the damages awarded by the jury were purely speculative and conjectural. The law in Illinois is well settled that the ascertainment and assessment of damages is a question of fact within the province of the jury. (*Arnold N. May Builders, Inc. v. Bruketta* (1981), 100 Ill. App. 3d 722, 729, 426 N.E.2d 1246, 1251.) However, the award cannot be sustained where the basis of the jury's computation is speculative or conjectural. (*First National Bank v. Shape Magnetronics, Inc.* (1985), 135 Ill. App. 3d 288, 293, 481 N.E.2d 953, 956; *Tonchen v. All-Steel Equipment, Inc.* (1973), 13 Ill. App. 3d 454, 461, 300 N.E.2d 616, 621.) While absolute certainty as to the amount of loss or damage is not required to justify recovery (*Arnold N. May Builders, Inc. v. Bruketta* (1981), 100 Ill. App. 3d 722, 728-29, 426 N.E.2d 1246, 1250-51), a plaintiff must establish a

reasonable basis for computation (*First National Bank v. Shape Magnetronics, Inc.* (1985), 135 Ill. App. 3d 288, 293, 481 N.E.2d 953, 956).

■ We will not enter into an examination of the testimony concerning the proper computation of damages, except to point out that it was contradictory. From the record before us, it is difficult to determine upon what basis the jury, from the evidence adduced, computed the amount of its award. For this reason, we find that the verdict of the jury as to the amount of damages is against the manifest weight of the evidence.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County as to liability; we reverse and remand the cause for a new trial on the issue of damages.

Affirmed in part and reversed in part and remanded.

McMORROW, P.J., and LINN, J., concur.