**In re POLO BUILDERS, INC., et al., Debtors.**

**David R. Brown, Trustee, Plaintiff,**

**v.**

**Real Estate Resource Management, LLC, Bharat Kothari, and Vasile Sava, Defendants.**

**Bankruptcy No. 04 B 23758.**
**Adversary No. 04 A 04032.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Jan. 24, 2008.

---

Bell, Boyd & Lloyd (Harley J. Gold-stein), Freeborn & Peters (Jeffrey J. May-er), for Movant and Plaintiff.

Zane, Smith & Associates, Ltd. (Zane D. Smith), for Respondent and Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

In June, 2004, Polo Builders, Inc. and its affiliated debtors filed voluntary petitions

for relief under Chapter 11 of the Bankruptcy Code. On August 16, 2004, those cases were converted to proceedings under Chapter 7 of the Bankruptcy Code, and the Plaintiff–Trustee ("Trustee" or "Plaintiff") was appointed by the United States Trustee to administer the Debtors' bankruptcy estates. The Trustee subsequently filed this Adversary Complaint against Real Estate Resource Management, LLC ("RERM") and its "Members" (as defined in the Operating Agreement of Real Estate Resource Management, LLC (*see generally* Joint Exhibit ("JX") 21)), Bharat Kothari ("Kothari") and Vasile Sava ("Sava") (collectively "Defendants"). The individual defendants, Kothari and Sava were each half owners of RERM with Sava acting as the sole "Manager" (also defined in the Operating Agreement).

The Trustee's First Amended Complaint alleges four counts for relief: Count I for breach of a contract for purchase and sale of 4180 North Marine Drive, Chicago, Illinois, (commonly known as "Polo Tower") for a price of sixteen-million-six-hundred-thousand dollars ("$16,600,000") to be paid by RERM; Count II for alter ego liability on the contract, asserted against Kothari; Count III for alter ego liability on the contract, asserted against Sava; and Count IV for fraud by RERM and Kothari for alleged misrepresentations and omissions concerning RERM's ability to perform under the contract.

After considering the evidence, including stipulated evidence, and arguments presented by the parties, the following Findings of Fact and Conclusions of Law are made and will be entered pursuant thereto. Judgments will separately enter for Plaintiff on Count I and for Defendants on the remaining Counts.

### FINDINGS OF FACT

The parties stipulated to a timeline and outline of facts, which are found as presented by the parties, marked as Stipulated Facts ("Stip.Fact"), and integrated here. The evidence presented at trial provided the further detail needed to decide the case.

Plaintiff argues that Defendants have stipulated themselves into defeat as to certain issues. As found and held below, that argument is rejected. The evidence presented at trial provided context and full history as to the Stipulated Facts. *See* Findings of Fact, *supra* ¶ 35 n. 2.

### The Parties

1. On June 23, 2004 ("Initial Petition Date"), Hasan Merchant ("Merchant"), Polo Builders, Inc., M & MM Enterprises, LLC, and Sheri Banoo Merchant ("Initial Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code"). (*See* Stip. Fact 7.)

2. On June 29, 2004, MG International, LLC (collectively with the Initial Debtors, the "Debtors") filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (*See* Stip. Fact 8.)

3. Plaintiff, the Trustee, was appointed by the Office of the United States Trustee on August 16, 2004 to administer the bankruptcy estates of the above captioned, jointly-administered debtors. (*See* Stip. Fact 1.)

4. The Trustee, on behalf of the Debtors' bankruptcy estates, held an interest in the property commonly known as Polo Tower located at 4180 North Marine Drive, Chicago, Illinois, and was attempting to sell the property pursuant to the Order Granting Motion of Chapter 7 Trustee for Entry of an Order: (A) Approving the Sale of Property Free and Clear of Liens, Claims and Encumbrances; (B) Surcharging Collateral; (C) Approving Bid Procedures and Bidding Protection for

Sale of Right to Designated as Agent; (D) Shortening Notice; and (E) Granting Related Relief ("Designation Rights Order" or "DRO") entered by this Court on September 16, 2004. (*See* Stip. Fact 10.)

5. Drs. Narendra and Geeta Gupta ("Guptas") invested in Polo Tower through entities controlled by Merchant and the affiliated debtors. The Guptas invested approximately $12 million through the affiliated debtors, as well as personally guaranteeing another $15–17 million in loans from other lenders. (Michael Goode ("Goode") Trial Test.)

6. At some point, the Guptas had second thoughts about their investment in Polo Tower and demanded that Merchant return their investment. (*Id.*) Merchant was unable to return the Guptas' money and, therefore, filed the underlying bankruptcy proceedings on behalf of himself and the affiliated debtors. (*Id.*)

7. The Guptas were concerned that any disposition of Polo Tower at a judicial sale might result in a substantial deficiency judgment against them as personal guarantors of the loans. (*Id.*)

8. Defendant Kothari is, and at all relevant times was, a resident of the State of Illinois. (*See* Stip. Fact 3.)

9. Kothari is a personal friend of the Guptas. (Kothari Trial Test.)

10. On July 13, 2004, Sava formed an Illinois limited liability company ("LLC") called Vasile Sava Real Estate Group, LLC. (*See* JX 20 at RERM0001–04.)

11. Defendant Sava is, and at all relevant times was, a resident of the State of Illinois. (*See* Stip. Fact 4.)

12. On July 19, 2004, Kothari and Sava executed the Operating Agreement of Real Estate Resource Management, LLC ("Operating Agreement"), (*see* JX 21 at RERM0007–34), and filed an amended Articles of Organization changing the name of Vasile Sava Real Estate Group, LLC to Real Estate Resource Management, LLC. (*See* JX 20 at RERM0005–06.)

13. Defendant RERM is a limited liability company organized under the laws of the State of Illinois. (*See* Stip. Fact 2.)

14. According to the Operating Agreement, Article 2.2:

> *Purposes.* The purposes of the Company are to own, maintain, manage, operate, sell, lease, develop, finance, dispose of, and otherwise invest in and deal with real estate including as a licensed real estate broker pursuant to the laws of the State of Illinois, and invest in entities which own or operate real estate; and to engage in any and all other activities related or incidental thereto.

(JX 21 at RERM0013 ¶ 2.2.) Thus, the scope of the limited liabilities company's business broadly covered activities in the real estate industry, although RERM was formed specifically to market and sell condominium units in connection with a real estate development at 1000 South Michigan Avenue, Chicago, Illinois. (Kothari Trial Test.)

15. Kothari and Sava each held a fifty percent interest in RERM, (*See* JX 21, Ex. A at RERM0033), and shared annual net income and losses accordingly. (*Id.* at RERM0015 ¶ 4.1.) However, according to the Operating Agreement, Article 6.3, "*Appointment of Initial Manager.* The Members hereby elect and appoint Vasile Sava as the sole Manager." (*Id.* at RERM0022 ¶ 6.3.) As a Member, Kothari did not have any right to "participate in the management and control of the conduct of the Company business and shall have no authority to act on behalf of or in the name of the Company, or at any time by any act or thing to bind the Company, unless otherwise provided herein." (*Id.* at RERM0018 ¶ 5.2.)

### The RERM Purchase and Sale Agreement

16. At some point during the spring and summer of 2004, Kothari and/or Sava developed an interest in Polo Tower. (Kothari Trial Test.; Sava Trial Test.) Their interest was twofold: (1) if they could facilitate a private sale of Polo Tower, they could reduce or eliminate the potential liability of Kothari's friends, the Guptas, on their loan guarantees; and (2) they hoped to generate business for RERM by "flipping" the property to another buyer at a profit and/or charging fees as a co-developer of the property. (Kothari Trial Test.)

17. In fact, in the spring of 2004, Sava showed Polo Tower to a potential buyer, who made an offer for purchase and sale of the property for approximately $18 million. (Sava Trial Test.) That contract was canceled due to concerns that arose about the condition of the property during the due diligence period. (*Id.*)

18. On August 16, 2004, this Court entered an order converting these cases to proceedings under Chapter 7 of the Bankruptcy Code. The Trustee was appointed by the United States Trustee to administer the Debtors' bankruptcy estates. (*See* Stip. Fact 9.)

19. In September, 2004, Kothari showed the property to John Murdoch ("Murdoch"), an Australian banker and financier, who was visiting Chicago and expressed an interest in investing in real estate in the city. (Kothari Trial Test.) It was Kothari's pursuit of Polo Tower on behalf of Murdoch that led to the signing of the Purchase and Sale Agreement and breach of contract which are the basis of this cause of action.

20. On September 16, 2004, Bankruptcy Judge Goldgar, to whom the bankruptcy case was assigned, entered the Designation Rights Order. (*See* JX 5 at PT000741–61.)

21. The DRO established bid procedures for assigning the Designation Rights.[1] (*Id.* at PT00747–48 ¶ 4.) DJM Asset Management, LLC ("DJM") agreed to act as the "stalking horse" bidder, submitting an initial bid of $175,000. (*Id.* at PT000743–44 ¶ H.) Nobody else submitted any bids, and DJM became the "Agent" pursuant to the DRO. (*See* JX 98, Goldstein Dep. Test. 7:7–14.)

22. DJM Asset Management, LLC, the company which employed Ronald Douglass ("Douglass"), paid $175,000 for the exclusive right to "rehabilitate, develop, market, and/or sell" certain of the Debtors' real property assets (as set forth in greater detail in the Designation Rights Order), including Polo Tower. (*See* Stip. Fact 24.)

23. Douglass was responsible for marketing and sale of the real property of the bankruptcy estates on behalf of DJM. (Douglass Trial Test.)

24. Exhibit C of the DRO listed certain requirements for the marketing and sale of Polo Tower, including:

a. "Absent written agreement between the Agent, the Trustee, and 4180 North Marine Drive, L.L.C., the Agent shall not sell Polo Tower absent payment in full of both 4180 North Marine Drive, L.L.C.'s Secured Claim against Polo Tower and any secured tax claims existing against Polo Tower.

---

[1]. The bid procedures for assigning the Designation Rights in the DRO are different from the Polo Tower Bid Procedures ("Bid Procedures"), which were drafted by DJM. *See* Findings of Fact, *supra*, at ¶ 25. Except for the definition of "Qualifying Deposit", which was incorporated into the Bid Procedures, the latter did not have to be, nor were they approved by the Court or the Trustee.

b. "To the extent the Agent has not procured both a sale contract and a Qualifying Deposit (as defined herein) for Polo Tower by October 17, 2004, the automatic stay shall be lifted without further order of court to permit 4180 North Marine Drive, L.L.C. to proceed with its remedies against Polo Tower in a non-bankruptcy forum.

c. "Upon entry of this Order, 4180 North Marine Drive, L.L.C. shall cooperate with the Agent and Trustee in effectuating a sale of Polo Tower . . . .

d. "For purposes of this exhibit, 'Qualifying Deposit' shall mean a purchaser's deposit, in an amount not less than five percent (5%) of the purchase price, which deposit shall become nonrefundable to such proposed purchaser upon the occurrence of a list of reasonable conditions agreed to by the Trustee, the Agent, and 4180 North Marine Drive, L.L.C."

(JX 5 at PT000759.)

25. DJM and its counsel were responsible for drafting an Agreement for the Purchase and Sale of Condominium Units ("Purchase and Sale Agreement" or "Agreement") and Bid Procedures for each of the subject real properties. (Douglass Trial Test.)

26. Amongst other things, the Bid Procedures drafted by DJM for Polo Tower required that the all bids must:

a. Be submitted "in writing pursuant to the procedures outlined below (a 'Bid') no later than 12:00 noon (prevailing Central Time) on October 14, 2004 (the 'Bid Deadline');

b. "include information regarding (i) the identity of the bidder and all contact information for an officer or agent of the bidder, and (ii) the bidder's present financial condition, including the bidder's ability to consummate the purchase, and (iii) the bidder's operational history;

c. "be unconditional and not contingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing or other approval, including from any board of directors, shareholder, members, regulatory body, or otherwise;

d. "be accompanied by an earnest money deposit (the 'Earnest Money Down Payment') equal to five percent (5%) of the total purchase price in the form of a certified or cashiers check payable to Freeborn & Peters LLP, as escrow agent ('Freeborn'), counsel to David R. Brown, the Chapter 7 Trustee (the 'Trustee') for Polo Builders, Inc., M & MM Enterprises, LLC, Hasan Merchant, Sheri Banoo Merchant and M.G. International, LLC (collectively, the 'Debtors') . . . . The Earnest Money Down Payment of the successful bidder will be (i) non-refundable and applied toward the purchase price paid by such bidder, (ii) retained as liquidated damages if the bidder fails to timely close, or (iii) refunded promptly if the purchase does not close through no fault of the successful bidder. If any bidder whose Bid is accepted defaults, such bidder's Earnest Money Down Payment will be forfeited . . . ."

e. Finally, the Bid Procedures provided that "DJM reserves the right at anytime to (i) impose additional terms and conditions or otherwise amend or modify the terms of any of the foregoing the [sic] procedures, (ii) extend the deadlines, (iii) reject any Bid or any Qualified Bid, and/or

(iv) withdraw the sale of Polo Towers."

(JX 12 at PT000684–85 ¶¶ 1–3.)

27. Between October 5 and October 15, 2004, Kothari and Douglass were in negotiations for the purchase and sale of Polo Tower. (Douglass Trial Test.)

28. The timing of a sale of Polo Tower was critical because the mortgagee on such property was only temporarily stayed from exercising its remedies outside of Bankruptcy Court and seeking to foreclose on the property. (*See* Stip. Fact 25.)

29. Specifically, Exhibit C to the Designation Rights Order required the Agent to obtain both a viable sale contract for Polo Tower and a "Qualifying Deposit" (a deposit equal to 5% of the purchase price) on or before October 17, 2004, or else the stay would lift automatically, allowing the mortgagee to pursue remedies against Polo Tower outside of Bankruptcy Court. (*See* Stip. Fact 26.)

30(a). If the automatic stay was lifted and Polo Tower was sold at a state court foreclosure proceeding, DJM would lose the right to any fees that it was entitled to as the Designation Rights Agent for which it had paid the Trustee $175,000.

(b) Pursuant to Exhibit C of the DRO, DJM waived its right to surcharge its fees from the proceeds of the Polo Tower sale against 4180 North Marine Drive, L.L.C., and limited that right against 22nd Century Partners, LLC (collectively the "Mortgagee") to no more than $50,000. (*See* JX 5 at PT000759.) Pursuant to the settlement of an adversary proceeding by DJM against the Mortgagee, DJM received $50,000 as compensation due under the DRO. (*See* JX 83 ¶ 2.) Douglass testified at his deposition that DJM earned total fees somewhere between $200,000 and $250,000 for its work in the bankruptcy. (*See* JX 95, Douglass Dep. Test. 145:8–21.)

(c) Thus, the fees from the sale of Polo Tower represent a significant portion of the return on DJM's investment, and provided a strong incentive to secure a purchase and sale agreement and "Qualifying Deposit" before the automatic stay lifted.

31. By Friday, October 15, the deadline for submitting bids to purchase Polo Tower as established by the Bid Procedures had passed, (*see* JX 12 at PT000684 ¶ 1), and the deadline for lifting of the automatic stay was fast approaching. (*See* JX 5 at PT000759.) Douglass received approximately six other bids for Polo Tower ranging from $10 million to $17 million, (Douglass Trial Test.), but continued to pursue an eleventh hour agreement with Kothari and RERM.

32. Prior to execution of the contract between the Agent and RERM, the Agent had the responsibility to determine if a bidder was qualified to bid on Polo Tower (and the other properties being sold pursuant to the Designation Rights Order). (*See* Stip. Fact 27.)

33. At the time of the Polo Tower transaction, RERM had no or virtually no assets. (*See* Stip. Fact 33.)

34. RERM operated out of the same address in which other companies of Kothari and Sava operated. (*See* Stip. Fact 34.)

35. RERM was notified by the Agent that it was the successful bidder on October 16, 2004. (*See* Stip. Fact 19.)[2]

2. Contrary to this Stipulation, the documentary and testimonial evidence adduced at trial establishes that the Agent, Douglass, notified Kothari that RERM was the successful bidder on Friday, October 15. (*See* JX 42 at RERM0036–37; Douglass Trial Test.; Kothari Trial Test.)

36. Douglass and Kothari agreed to meet in the parking lot of Sally's Restaurant on Saturday, October 16, 2004. (Douglass Trial Test.; Kothari Trial Test.)

37. On or about Saturday, October 16, 2004, RERM executed that certain Agreement for the Purchase and Sale of Condominium Units ("Purchase and Sale Agreement" or "Contract") with the Agent (the term "Agent" being defined in the Designation Rights Order), on behalf of the Trustee. (*See* Stip. Fact 11.)

38. The Purchase and Sale Agreement provides that RERM ("Purchaser" under the Purchase and Sale Agreement) was to pay the purchase price of $16,600,000 for Polo Tower. (*See* Stip. Fact 12.)

39. The Purchase and Sale Agreement provides that RERM was to provide an earnest money deposit of $833,000 simultaneously with its delivery of the Purchase and Sale Agreement in accordance with the terms thereof and of the Bid Procedures. (*See* Stip. Fact 13.) Five percent of $16,600,000 is $830,000, but the amount of the earnest money deposit will be treated as $833,000 in accordance with the specific term of the Agreement.

40. The Purchase and Sale Agreement provides that the closing "shall take place on or before the date that is the fifteenth (15th) day following notification to the purchaser that it is the successful bidder in accordance with the Bid Procedures." (*See* Stip. Fact 14.)

41. No executed or initialed Bid Procedures were attached to the Purchase and Sale Agreement; however, the Purchase and Sale Agreement provided that the "Polo Tower Bid Procedures" are incorporated therein. (*See* Stip. Fact 15.)

42. The Polo Tower Bid Procedures provided that the earnest money be in the form of a cashier's or certified check payable to Freeborn & Peters LLP as escrow agent. Paragraph three of the Bid Procedures also provides that the Agent may "amend or modify" any provision of the Bid Procedures "at anytime." (*See* Stip. Fact 16.)

43. A supposed earnest money check was tendered by the Defendants in the form of a check dated October 19, 2004, drawn on the account of "Vasile Sava Real Estate Broker" in the amount of $833,000. (*See* Stip. Fact 17.) At no time mentioned herein were there sufficient funds in that account to cover the payment of that check, nor was it ever tendered for collection.

44. Douglass had never heard of Vasile Sava before seeing his name on the earnest money deposit check. (Douglass Trial Test.)

45. The earnest money check RERM tendered was not a certified or cashier's check. (*See* Stip. Fact 18.)

46. Douglass testified that Kothari tendered the check in the parking lot of Sally's Restaurant on October 16. (Douglass Trial Test.) This is consistent with Kothari's handwritten notes from 8:00 p.m. on October 16: "Advised [John Murdoch] that RERM had executed agreement on his behalf and advanced a $833K check w/o money in account. They should confirm remittance ASAP." (JX 42 at RERM0039.)

47. Kothari and Sava testified that the check was written and tendered on Tuesday, October 19, after a telephone conversation with Douglass and Harley Goldstein ("Goldstein"), counsel for the Trustee, during which Defendants explained that they did not have funds to make the earnest money deposit, which would be made by a wire transfer from their investor, Murdoch. (Kothari Trial Test.; Sava Trial Test.)

48. However, a date stamped facsimile copy of the check attached to a letter from

Douglass to the Mortgagee was entered into evidence at trial. (Plaintiff's Exhibit ("PX") 106.) Although the letter is dated Sunday, October 17, the date stamp from the facsimile transmission is Monday, October 18. (*Id.*) Thus, the evidence establishes that the check was tendered to Plaintiff no later than October 18.

49. At trial, Douglass and Goldstein vigorously denied that they knew that Defendants did not have sufficient funds to honor the check when it was tendered to Douglass. (Douglass Trial Test.; Goldstein Trial Test.) In addition, Plaintiff argues that prior to signing the Agreement and tendering the check for the earnest money deposit, Kothari misrepresented the source of the earnest money deposit funds as already being located in the United States. The preponderance of the evidence suggests that Plaintiff and his witnesses are wrong on both these points.

50. First, Douglass' October 5, Telephone Contact Sheet memorializing a conversation with Kothari contains the following handwritten note: "U.S. Gov't under Patriot Act. Coming from Hong Kong. HSBC." (JX 7 at PT00004.) These notes, which were made contemporaneously with Douglass and Kothari's conversation, do not indicate that the financing was coming from two different sources, so it can be inferred that Douglass did not understand that the funding source was already in the United States.

51. Second, at his deposition, which was entered into evidence, Douglass testified that he could not recall whether he was told before or after the Agreement was signed that funds for the earnest money deposit were located domestically. (*See* JX 95, Douglass Dep. Test. 43:9–24, 44:1–6.)[3] After reviewing a November 12, 2004, email from Goldstein to Defendants' counsel, Thomas Murphy ("Murphy"), (*See* JX 32 at PT000827), Douglass modified his early testimony, and testified that Kothari told him prior to signing the Agreement that the earnest money deposit funds were located domestically. (*See* JX 95, Douglass Dep. Test. 92:9–24, 93:1–15.)

52. However, at his deposition, which was also entered into evidence, Goldstein characterized his correspondence with counsel in this matter as "positioning." (*See* JX 98, Goldstein Dep. Test. 42:17–24, 43:1–7.) It is just as likely that the November 12, email is referring to a series of emails exchanged by Murphy, RERM's attorney, and Goldstein on October 19 and 20, in which Murphy represented, on behalf of Kothari, that a wire transfer had been completed from Hong Kong Shanghai Bank Corp. ("HSBC Bank") and the ear-

---

**3.** Q: And do you recall having a specific conversation with Kothari prior to his signing the contract for the sale of Polo Towers where he specifically identified a location in the United States where the funds for the earnest deposit for Polo Towers were located?

A: I honestly can't recall whether it was pre getting the contract or after just because of the passage of time I guess, but—because, you know, I know subsequently for sure we knew that it was Bank of New York that he indicated there were funds, but he had been talking about making a wire transfer, so I think it was before. But he did identify the actual entity or banking entity that it would be coming from that I can recall.

Q: He didn't or did?
A: He did not.
Q: Okay. So you can't recall whether it was before he signed the contract for Polo Tower or after he signed the contract for Polo Tower, but he did at some point advise you that he had funds located in the United States to satisfy the deposit requirement for the sale of Polo Tower?

. . .

A: Yes. He did state that he had funds available for the deposit and that those were already in the United States.

nest money deposit funds were sitting in the Bank of New York. (*See* JX 25 at PT000826.)

53. Thus, it is found that Douglass knew that the funds for purchasing Polo Tower were supposed to be coming from Hong Kong, and might be delayed by requirements of U.S. antiterrorism legislation. The November 12, email is evidence of Plaintiff's position that there was a breach of contract, but is not dispositive of the timing of Kothari's alleged misrepresentation.

54. At trial, Kothari testified that during the October 5, conversation, he told Douglass that the funds for the purchase of Polo Towers would come from HSBC Bank, and were subject to Patriot Act requirements, but denied that he ever told Douglass that the earnest money deposit would come from domestic sources. (Kothari Trial Test.)

55. Douglass' modification of his deposition testimony was influenced by and based on Goldstein's aggressive characterization of the facts, and Douglass' subsequent trial testimony cannot be given great weight. Thus, it is found that prior to signing the Agreement on October 16, Kothari did not represent to Douglass that the funds for the earnest money deposit were available within the United States.

56. Kothari told Douglass that the earnest money deposit check tendered for Polo Tower would be replaced by a wire transfer. (*See* Stip. Fact 37.)

57. As to whether Plaintiff, or any of his agents, knew that there were insufficient funds to honor the check when it was tendered by Kothari to Douglass, it is found that:

a. According to Kothari's handwritten notes, on Friday, October 15, Douglass informed Kothari that RERM's bid for Polo Tower had been accepted, and that he needed the $833,000 earnest money deposit and would execute the agreement as the Trustee's authorized agent. (*See* JX 42 at RERM0036.) The notes also indicate that "[Kothari] told him that RERM was in no position to put up the funds, however [Kothari] would call John [Murdoch] and ask him to wire transfer the funds." (*Id.*)

b. Also on October 15, Goldstein and Douglass had a telephone conversation with Kothari and Murphy during which Goldstein, as the Trustee's agent, agreed to accept the earnest money deposit in the form of a wire transfer rather than certified funds. (Goldstein Trial Test.) This conversation is confirmed by Goldstein's billing records attached to a fee application submitted in the bankruptcy. (*See* JX 92 at FEE APP000052.)

c. Despite this agreement to accept the earnest money deposit by wire transfer, the Trustee and DJM still needed to obtain a "Qualifying Deposit" by Sunday, October 17. Therefore, on Saturday, October 16, Douglass contacted Kothari and, according to Kothari's handwritten notes, told him that:

It was imperative that I meet him with a check and execute [sic] contract as [Harley Goldstein] had to present [sic] in court on Monday. Suggested we give him a check, he would hold, until [John Murdoch's] transfer. Told him I would have to get an RERM check signed by Sava—couldn't meet till late evening.

(JX 42 at RERM 00038.)

d. On Monday, October 18, Goldstein sent Murphy an email stating:

We've received signed contracts from Bharat [Kothari] for both the Polo Towers [sic] and Polo Woods, in the amount of $16.6 million and $1.7 million, respectively. *As planned, he gave us a check for the deposit on*

*Polo Towers* [sic] *in the amount of $833, 000, which is to be replaced with a wire transfer tomorrow.*

(JX 15 at PT000861 (emphasis added).) The phrase "[a]s planned" supports Goldstein's testimony regarding the October 15, telephone conversation, and the conclusion that there was an agreement to accept a later wire transfer rather than certified funds at the time of signing the Agreement.

e. The Trustee and his agent, DJM, had a financial motive for accepting the check regardless of whether or not it was backed by sufficient funds. The check was used to demonstrate to the Mortgagee that the Trustee and DJM had obtained a purchase and sale agreement and a "Qualifying Deposit" received within the deadline set by the DRO.

f. At trial, Kothari testified that he knew there were insufficient funds to honor the check when he tendered it to Douglass. (Kothari Trial Test.) That testimony is supported by his handwritten notes from 8:00 p.m. on October 16, stating that he "advanced $833K check w/o money in account." (JX 42 at RERM0039.) He did this with the understanding that Douglass and the Trustee held the same belief, and were holding the check as a "placeholder." (Kothari Trial Test.)

g. Finally, the "placeholder" check was never presented by the Trustee or DJM to any bank for collection, nor did they communicate with the drawee bank as to the status of funds in the account. This is circumstantial evidence corroborating Kothari's testimony that the Trustee and DJM knew all along that the check was not backed by bank funds.

58. Plaintiff argues that the inconsistency between Kothari and Sava's testimony (that the check was tendered on October 19, after a conversation with Goldstein and Douglass), and the documentary evidence (which establishes that the check was tendered no later than October 18), destroys Defendants' credibility on all these issues. However, the evidence establishes that there was a conversation between Goldstein and Douglass, and Kothari and Murphy on October 15, during which the Trustee agreed to accept the earnest money deposit in the form of a wire transfer rather than certified check, which suggests that Defendants merely confused the dates in testifying about events that occurred more than three years earlier. Furthermore, Plaintiff did not recall Douglass or Goldstein to the stand to rebut Defendants' testimony.

59. The Defendants advised the Agent that they would replace the check tendered as the earnest money deposit with a wire transfer, but no wire transfer of funds were ever received. (*See* Stip. Fact 20.)

60. During the Polo Tower transaction, Thomas Murphy ("Murphy") acted as one of the Defendants' attorneys. (*See* Stip. Fact 38.)

61. Murphy's bills for the Polo Tower transaction, as well as for this litigation, were billed to Kothari individually. (*See* Stip. Fact 39.)

62. Murphy was not aware whether RERM, or Kothari individually, was attempting to purchase Polo Tower until after Defendants defaulted and litigation ensued. (*See* Stip. Fact 41.)

63. As of October 18, 2004, Murphy was aware that a contract for approximately $16,000,000 had been signed for the purchase of Polo Tower and that the earnest deposit of $833,000 was required for such contract. (*See* Stip. Fact 40.)

64. Murphy was aware that a wire transfer for the earnest money was sup-

posed to be coming immediately. (*See* Stip. Fact 42.)

65. Between Tuesday, October 19, and Thursday, October 21, Kothari, personally or through Murphy, communicated with Goldstein and Douglass that the wire transfer to complete the earnest money deposit was on its way. (*See* JX 24–27.)

66. On October 19, 2004, Murphy sent the Trustee's counsel, Harley Goldstein ("Goldstein"), an electronic mail correspondence, which correspondence is attached to Murphy's deposition in this matter as Exhibit 5 (the "First E–Mail"). (*See* Stip. Fact 43.)

67. The First E–Mail stated, "Harley, just received word that the funds are to be transferred overnight by wire from Hong Kong to our Firm's client fund account and that the funds will show as deposited in the morning. As soon as I confirm the receipt of the funds, I will notify you." (*See* Stip. Fact 44.)

68. On October 20, 2004, Murphy sent another electronic mail correspondence to Goldstein, which correspondence is attached to Murphy's deposition in this matter as Exhibit 6 (the "Second E–Mail"). The Second E–Mail stated:

> The funds have been wired from the Hong Kong to the Bank of New York. The bank in Hong Kong does not have a correspondent in Chicago. The Bank of New York has instructions to wire the funds to our Firm's client fund account immediately. My client is in the process of tracing the wire to the Bank of New York. I have been assured that the wire will hit my Firm's account today.

(*See* Stip. Fact 45.)

69. According to Defendants, the information contained in the October 20, 2004 e-mail was provided by Kothari. (*See* Stip. Fact 46.)

70. It is found that this is the first time that the Trustee or his agents had an understanding that the funds for the earnest money deposit were located in the United States.

71. Murphy was never provided with any confirmation that any funds were wired from Hong Kong to New York, and he believes no funds were ever wired. (*See* Stip. Fact 47.)

72. Sometime before October 25, 2004, Murphy advised the Agent and Goldstein that funds for the deposit of Polo Tower were sitting in a bank in New York but were held up from –20–being wired into Goldstein's firm's account because of Patriot Act restrictions. (*See* Stip. Fact 49.)

73. Kothari told Douglass that the funds to replace the escrow deposit check for Polo Tower had been wired from Hong Kong to New York. The escrow deposit funds were never tendered. (*See* Stip. Fact 36.)

74. Defendants failed to produce any documents or evidence that funds were wired from Hong Kong to New York, or anywhere else, to replace the check submitted in lieu of the required escrow deposit for Polo Tower. (*See* Stip. Fact 48.)

75. On October 25, 2004, Goldstein, on behalf of the Trustee, sent a letter to Kothari, and to Murphy, his counsel, declaring a breach of contract for failing to tender the earnest money deposit, and that the Trustee would pursue his "legal rights and remedies" if the earnest money deposit was not received by noon on Tuesday, October 26. (*See* JX 16 at PT000835.)

76. Defendants did not meet the October 26, deadline for tendering the earnest money deposit. Thus, RERM was in default as of October 25, and the Agreement was terminated on October 26.

77. As of November 12, 2004, Murphy continued to pass along information to the

Agent and Goldstein that funds had actually been wired from Asia and were in New York. (*See* Stip. Fact 51.)

78. After Plaintiff advised Defendants that they were in default under the Purchase and Sale Agreement for Polo Tower, Murphy sent Goldstein a further electronic mail correspondence dated November 12, 2004, which correspondence is attached to Murphy's deposition in this matter as Exhibit 9 (the "Third E-mail"). In the Third E-mail, Murphy stated that funds for the Polo Tower deposit were in existence but they were delayed because of certain "clearance" issues. (*See* Stip. Fact 50.)

79. No funds were ever received from Hong Kong to Murphy's law firm's account. (*See* Stip. Fact 53.)

80. Murphy stated at his deposition that he doubted the money was ever actually in New York. (*See* Stip. Fact 52.)

81. No funds of Defendants were ever received by wire transfer by the Trustee, the Agent, or the Trustee's counsel. (*See* Stip. Fact 54.)

82. The Plaintiff served document requests on the Defendants seeking all documents relating to the wire transfer of funds made by the Defendants. The Defendants have never produced any documents from any financial institutions responsive to the aforementioned Requests for Documents. (*See* Stip. Fact 35.)

### Litigation against the Mortgagee

83. During late-October 2004, the Trustee was engaged in state court litigation to prevent the Mortgagee from proceeding with the foreclosure against Polo Tower. (Goldstein Trial Test.) In order to do this, it was important for the Trustee to perpetuate the appearance that he had obtained a purchase and sale agreement and "Qualifying Deposit" in compliance with the DRO. (*See* Plaintiff Exhibit ("PX") 106.)

84. If it was found by the state court that the Trustee had not complied with the DRO, the Trustee argued in the alternative that he was unable to do so because the Mortgagee was not in compliance with certain provisions of the DRO that required it to provide payoff numbers so that DJM could negotiate a sale of Polo Tower. (*See* JX 5, Ex. C at PT000759; JX 30 at PT00141; JX 98, Goldstein Dep. Test. 37:16–57:20.)

85. At his deposition, Goldstein testified that the Trustee took this "position" in order to buy time for the Defendants to come up with the earnest money deposit, (*id.* at 53:2–3), but the Trustee and DJM had other strong motives in resisting the Mortgagee's efforts to foreclose. The Trustee wanted to use the proceeds from a successful sale of Polo Towers to benefit the estate, and DJM wanted to receive its brokerage fees on the sale for which it had paid $175,000 to the Trustee.

86. On October 26, 2004, after the Trustee declared a breach of contract, the Mortgagee filed a Notice of Default, (*see* JX 17), so that it could pursue its state court foreclosure remedies. In response, DJM filed an Adversary Complaint against the Mortgagee in this Court seeking an accounting and payoff letter. *See DJM Asset Management, LLC v. 4180 North Marine Drive LLC et al.*, No. 04–A–03962 (Bankr.N.D.Ill.2004)

87. The filing of that Adversary further stalled the Mortgagee's efforts to foreclose so that the Trustee could seek another buyer for Polo Tower.

88. DJM and the Mortgagee settled the Adversary proceeding on March 2, 2005. (*See* JX 83.) At trial in this matter, Douglass and Goldstein both testified that DJM incurred legal fees as a result of the Adversary litigation with the Mortgagee, and that those fees were eventually passed

on to the Trustee. (Douglass Trial Test.; Goldstein Trial Test.) However, the Settlement Agreement entered into by DJM and the Mortgagee required the lender to "carve-out" $167,079.31 from its collateral, which amount included $75,857.58 in attorneys' fees incurred as a result of the adversary proceeding. (*See* JX 83 ¶ 2.)

### The Replacement Purchase and Sale Agreement

89. A month after the Trustee's attorney declared RERM in breach, a new purchaser was obtained. On November 24, 2004, DJM, on behalf of the Trustee, entered into an Agreement for the Purchase and Sale of Condominium Units located at 4180 North Marine Drive, Chicago, Illinois, with Reza Toulabi ("Toulabi Agreement"). (*See* JX 51 at PT000397–412.) The agreed purchase price was $16,490,000. (*Id.* at PT000398 ¶ 2.)

90. There were three addendums to the Toulabi Contract.

a. The First Addendum, entered into on November 24, increased the amount of the earnest money deposit to $200,000. (See JX 52 at PT000395–96 ¶ 2.)

b. The Second Addendum, entered into on November 24, provided for: (i) additional consideration of $355,000 to address certain mechanics liens with a credit to Purchaser at closing; and (ii) additional consideration of $50,000 in exchange for a closing date after December 1, 2004. (*See* JX 53 at PT000392–94 ¶¶ 2–3.) Toulabi thereby paid an additional $405,000 in consideration, subject to certain credits at closing, for the purchase of Polo Tower.

c. The City of Chicago had cited Polo Tower for certain Building Code violations regarding the building facade. As of December 31, 2004, the Mortgagee had incurred $289,409.78 in expense towards repairing the facade (*See* JX 60.)

Therefore, the Third Addendum, entered into on January 7, 2005:(i) provided for a closing date of January 18; (ii) set December 31, 2004, as the date for the proration of taxes; (iii) required Purchaser to pay the per diem interest that continued to accrue after January 1, 2005; and (iv) required Purchaser to bear the responsibility for the cost of the facade repairs in excess of $140,000. (*See* JX 54 at PT000389–91 ¶¶ 2–4, 6.)

91. The Toulabi closing was concluded less than ninety (90) days after the earliest date on which the RERM sale could have closed. (*See* Stip. Fact 28.)

### Other Evidence

92. The Purchase and Sale Agreement contains a liquidated damages clause at paragraph 17B. The Bid Procedures also reference the liquidated damages clause at paragraph 2(d). (*See* Stip. Fact 21.)

93. The amount of the liquidated damages provision of the Purchase and Sale Agreement was set by the Agent. (*See* Stip. Fact 22.)

94. Section 6(A) of the Purchase and Sale Agreement provides that the seller was to provide the purchaser with a special warranty deed at closing. (*See* Stip. Fact 23.)

95. John Hausmann ("Hausmann") was listed as an expert and was offered as an expert witness by the Plaintiff in this case. (*See* Stip. Fact 29.)

96. Hausmann, a financial and investment professional with experience in real estate finance and development, reviewed the RERM contract and other relevant documents regarding the sale of Polo Tower in order to determine the actual damages sustained by the Trustee as a result of the of RERM's default. It is the opinion of Hausmann that the actual damages sustained by the Trustee as a result of

RERM's default is at least $1,005,811. (*See* Stip. Fact 30.)

97. Hausmann's belief that liquidated damages are "appropriate in this case" is based on his belief as a real estate expert and not as an attorney. (*See* Stip. Fact 31.)

98. Hausmann did not render any legal opinions as to said conclusions. (*See* Stip. Fact 32.)

99. The Agreement contains a choice of law clause designating the State of Illinois as the source of law under which the Agreement shall be governed. (JX 13, PT000732 ¶ 18(K).)

100. Statements of fact contained in the Conclusions of Law section shall constitute additional Findings of Fact.

### *JURISDICTION*

Subject matter jurisdiction lies under 28 U.S.C. § 1334. This matter is before the Court pursuant to 28 U.S.C. § 157 and referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. § 1409. This issue constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A). *See In re Ben Cooper, Inc.*, 896 F.2d 1394, 1400 (2d Cir.1990) ("[T]he bankruptcy court has core jurisdiction, pursuant to § 157(b)(2)(A), over contract claims under state law when the contract was entered into post-petition."); *In re Elegant Equine*, 155 B.R. 189, 191 (Bankr.N.D.Ill. 1993).

### *CONCLUSIONS OF LAW*

#### *District Court Guidelines Not Applicable in this Case*

■ As a threshold matter, in Chapter 7 Trustee's Response to the Defendants' Findings of Fact and Conclusions of Law Following Trial ("Trustee's Response"), Plaintiff argues that the Court should adopt and incorporate his proposed Findings of Fact and Conclusions of Law, because Defendants' proposed Findings of Fact and Conclusions of Law After Trial ("Defendants' proposed FFCL") do not comply with Guidelines of the District Court for Proposed Findings of Fact and Conclusions of Law ("District Court Guidelines"). *See* Local Rules of the United States District Court Northern District of Illinois (Apr. 20, 2007), *available at* http://www.ilnd.uscourts.gov/LEGAL/NewRules/proposed_findings_guidelines.htm. According to paragraph "(c)" of the District Court Guidelines:

> Each defendant's answering proposals shall correspond to plaintiff's proposals:
>
> (1) Each defendant's factual statement shall admit or deny each separate sentence contained in the narrative statement of fact of each plaintiff, except in instances where a portion of a sentence can be admitted and a portion denied. In those instances, each defendant shall state clearly the portion admitted and the portion denied. Each separate sentence of each defendant's response shall bear the same number as the corresponding sentence in the plaintiff's narrative statement of fact. In a separate portion of each defendant's narrative statement of facts, such defendant shall set forth all affirmative matter of a factual nature relied upon by such defendant, constructed in the same manner as the plaintiff's narrative statement of facts.
>
> (2) Each defendant's separate statement of proposed conclusions of law shall respond directly to plaintiff's separate legal contentions and shall contain such additional contentions of the defendant as may be necessary to demonstrate the non-liability or

limited liability of the defendant. Each defendant's statement of legal contentions shall be constructed in the same manner as is provided for the similar statement of each plaintiff.

 Plaintiff argues that those District Court Guidelines are incorporated into the Local Bankruptcy Rules for the Northern District of Illinois ("Local Bankruptcy Rules") by paragraph 3 of the Introduction thereto which provides that the Local Bankruptcy Rules "include the substance of all local Civil Rules of the District Court of general procedural impact to keep practice before the Bankruptcy Court similar to practice before the District Court. . . ." The Local Bankruptcy Rules in this District were adopted by the District Court. However, according to Local Bankruptcy Rule 1000–2(C), "The District Court Local Rules shall apply to the Bankruptcy Court and bankruptcy cases *only when the District Court Local Rules or these Rules so specify, or when applied by any judge to proceedings before that judge in situations not covered by these Rules or applicable law.*" (Emphasis added). Following the maxim of statutory construction that the specific language in a statute governs the general (noscitur a sociis is ejusdem generis to Latin buffs), *see Varity Corp. v. Howe,* 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the specific language of Local Bankruptcy Rule 1000–2(C) governs the general statement in paragraph 3 of the Introduction to the Local Rules. The District Court Guidelines do not specify that they apply in bankruptcy cases, and the undersigned did not apply them in this case through the Final Pretrial Order or by any other order. Thus, Defendants' proposed FFCL will not be stricken, and the arguments contained therein will be given full consideration.

### Count I: Breach of Contract for the Purchase and Sale of Real Estate

To establish a claim for breach of contract, Plaintiff must prove that a valid contract existed between him and the corporate defendant, RERM; that Plaintiff substantially performed his obligations under the contract; that RERM breached the contract; and that Plaintiff was damaged by the breach. *Klem v. Mann,* 279 Ill.App.3d 735, 216 Ill.Dec. 454, 665 N.E.2d 514, 518 (1996).

 On Saturday, October 16, Kothari, on behalf of Defendant RERM, entered into a written agreement with Douglass, on behalf of the Trustee, to purchase Polo Tower. *See* Findings of Fact, *supra,* ¶ 37. During opening argument at trial, Defendants suggested that there was not a valid contract because there was no consideration, which is an element of contract formation, *see Martin v. Government Employees Ins. Co.,* 206 Ill.App.3d 1031, 151 Ill.Dec. 926, 565 N.E.2d 197, 199 (1990), in that the Trustee never received the earnest money deposit. This argument is without merit. Consideration is the bargained-for exchange of promises or performances, and may consist of a promise, an act or a forbearance. *See McInerney v. Charter Golf, Inc.,* 176 Ill.2d 482, 223 Ill. Dec. 911, 680 N.E.2d 1347, 1350 (1997); Restatement (Second) of Contracts § 71 (1981). Thus, the Illinois Supreme Court has found that "mutual assent and an exchange of promises provides consideration to support the formation of a contract." *McInerney,* 223 Ill.Dec. 911, 680 N.E.2d at 1350. In this case, the Trustee promised to sell Polo Tower and Defendants promised to purchase it for $16,600,000 and, therefore, there was consideration for the formation of a bilateral executory contract. Defendants do not otherwise challenge the sufficiency of contract formation. There-

fore, it is found and held that the Purchase and Sale Agreement was a valid contract when it was executed by representatives for both parties on October 16, 2004.

■ In the alternative, Defendants argue that the contract was subject to certain conditions precedent that did not occur, or that the Trustee did not perform his obligations under the contract thereby excusing RERM's performance. First, Defendants argue that the understanding reached on Friday, October 15, between Goldstein and Douglass for the Trustee, and Kothari and Murphy for RERM (that the Trustee would accept the earnest money deposit in the form of a wire transfer rather than by certified check as required by the Bid Procedures), transformed the Agreement into a contingent contract subject to RERM's ability to obtain financing. This argument is factually and legally without merit. The evidence establishes that Kothari knew the Trustee would not accept a bid that contained a financing contingency. (*See* JX 10; Douglass Trial Test.; Kothari Trial Test.) According to an October 5, email from Douglass to Kothari that was retransmitted on October 7:

> Attached are the bid procedures and purchase contract we have asked potential buyers to sign. I noticed that the contract you submitted through Michael Goode called for a financing contingency among other things that are not in our contract. *You would have to demonstrate your ability to close by having financing in place at the time of your bid submittal.*
>
> Call me and we can discuss what you would need to do in order to put your bid in an acceptable form.

(JX 10 (emphasis added).)

■ In addition, the Agreement contains an integration clause. (*See* JX 13 at PT000731 ¶ 18(B).) "When a contract contains an integration clause, it is improper to consider extrinsic evidence of prior negotiations to create an extrinsic ambiguity." *Regency Commercial Associates, LLC v. Lopax, Inc.*, 373 Ill.App.3d 270, 311 Ill.Dec. 636, 869 N.E.2d 310, 326 (2007) (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884–85 (1999)). The parties agreed on October 15 to accept the earnest money deposit in the form of a wire transfer rather than certified funds, a day before the Agreement was signed on October 16. Testimony was heard and evidence admitted regarding the October 15, negotiations for the limited purpose of showing the understanding of the parties regarding the form of the earnest money deposit, and not to allow Defendants to create any ambiguities in the Agreement. The Bid Procedures, which were incorporated into the Agreement, (*see* JX 13 at PT000723 ¶ D), required bids to "be unconditional and noncontingent upon any event, including, without limitation, any due diligence investigation, the receipt of financing and further approval, including from any board of directors, shareholders, members, regulatory body, or otherwise...." (JX 6 at PT000684 ¶ 2C.) Finally, the understanding modifying the timing, source, and means to pay the earnest money deposit does not suggest that there was any agreement to make the Agreement subject to a financing contingency. It must therefore be found and held that the Agreement was not subject to any condition precedent regarding Defendants' ability to obtain financing.

According to paragraph 3 of the Agreement:

> *EARNEST MONEY DEPOSIT.* Simultaneous with Purchaser's delivery of this Agreement, in accordance with the terms of the Bid Procedures, Purchaser shall also deliver a deposit an [sic] amount equal to five percent (5%) of the

Purchase Price (**Eight Hundred and Thirty Three Thousand and 00/100 Dollars ($833,000.00)**) (the "Down Payment Deposit") with Freeborn & Peters LLP ("**Freeborn**").... (JX 13 at PT000724 ¶ 3.) Thus, RERM's duty to pay the earnest money was part of the Agreement.

■ The agreement by Trustee to accept the earnest money deposit by wire transfer instead of certified check does not support Defendants' argument that there was never an enforceable contract. "A party to a contract may waive performance of a condition precedent by the other party where the condition precedent is intended for the benefit of the waiving party." *Catholic Charities of Archdiocese of Chicago v. Thorpe*, 318 Ill.App.3d 304, 251 Ill. Dec. 764, 741 N.E.2d 651, 654–55 (2000) (citing *Quake Construction, Inc. v. American Airlines, Inc.*, 181 Ill.App.3d 908, 130 Ill.Dec. 534, 537 N.E.2d 863, 868 (1989)) ("a party may waive a condition precedent to the formation of a contract"). According to paragraph 3 of the Bid Procedures, "DJM reserves the right at anytime to (i) impose additional terms and conditions or otherwise amend or modify the terms of any of the foregoing the [sic] procedures...." (JX 6 at PT000685 ¶ 3.) Thus, by agreeing to accept the earnest money deposit by wire transfer, the Trustee waived the requirement that the earnest money deposit be made in the form of certified check. However, the fact that the Trustee took an uncertified personal check written by Sava as a "placeholder" used to stall the Mortgagee's efforts to foreclose does not indicate that it was Trustee's intent or agreement to waive the earnest money deposit requirement altogether. Obtaining a "placeholder" check to show the earnest money deposit in some form was a device to demonstrate to the Mortgagee that the Trustee had secured a

"Qualifying Deposit." But none of this helps Defendants. Real Estate Resource Management breached the contract when it failed at any time to tender the earnest money deposit either simultaneously with execution of the Agreement or later by wire transfer. Finally, it is also clear that RERM never came up with the funds to pay the agreed purchase price and, therefore, breached the Agreement by failing to close the transaction.

■ Finally, Defendants argue that RERM should be excused from performance, because the Trustee would have been unable to provide a special warranty deed as required by the Agreement, (*see* JX 13 at PT000724 ¶ 6(A)), within the short fifteen day period required for closing. (*Id.* at ¶ 4.) However, the need to receive evidence on this issue was eliminated by the fact that Kothari and RERM, in their Answers and Affirmative Defenses to First Amended Complaint ("Answers"), admitted that the Trustee was "ready, willing, and *able* to close under the Purchase and Sale Agreement...." (JX 2 ¶ 32; JX 4 ¶ 32 (emphasis added).) Defendants never sought leave to amend those Answers and Plaintiff's pre-trial Motion *in Limine* to bar evidence on that subject was granted. That admission along with other admissions of well pleaded facts admitted in the pleadings came into evidence pursuant to the Final Pre–Trial Order. Thus, any argument that the Trustee was unable to close the contracted sale was barred by Defendants' admissions and cannot be a defense to RERM's breach.

Having determined that there was a valid contract, that there were no conditions precedent, and that Trustee was ready to perform all his obligations under the Agreement, there remains no real argument by Defendants that RERM did not breach the Agreement.

### Count I: Enforceability of Liquidated Damages Clause

 The next issue regarding Plaintiff's Count I claim for breach of contract is the measure of his damages. Paragraph 17(B) of the Agreement contains a liquidated damages clause:

Notwithstanding anything to the contrary contained in this Agreement, if Purchaser fails to perform in accordance with the terms of this Agreement, at Seller's option, seller may elect to terminate this Agreement, and receive the Earnest Money as liquidated damages as its sole and exclusive remedy, in which case this Agreement shall, without further action of the parties, become null and void and neither party shall have any rights or obligations under this Agreement. Seller and Purchaser acknowledge and agree that (i) it would be extremely difficult to accurately determine the amount of damages suffered by Seller as a result of Purchaser's default under this Agreement, (ii) the Earnest Money is a fair and reasonable amount to be retained by Seller as agreed and [sic] liquidated damages for Purchaser's default under this Agreement, and (iii) retention by Seller of the Earnest Money upon Purchaser's default hereunder shall not constitute a penalty or forfeiture.

(JX 13 at PT000731 ¶ 17(B).) Plaintiff argues that he is therefore entitled to receive $833,000, the amount of the earnest money deposit, as liquidated damages. Defendants respond that the liquidated damages clause is unenforceable as a matter of law, because (i) it was unreasonably high and, therefore, constituted a penalty; and (ii) it gave Plaintiff the option of seeking liquidated damages or actual damages. In the alternative, Defendants argue under Illinois law that a party is only entitled to retain those monies as liquidated damages as the party actually received, and the Trustee never received the earnest money deposit as the uncertified check that was received was a symbolic but worthless "placeholder" until real money was to be wired. Plaintiff responds that Defendants waived any argument regarding the enforceability of the liquidated damages clause, because they failed to plead the issue as an affirmative defense in their Answers, or the clause created an independent contractual obligation that was breached by Defendants' failure to provide the earnest money deposit. (See Chapter 7 Trustee's Revised Proposed Findings of Fact and Conclusions of Law Following Trial ("Plaintiff's Revised FFCL") at ¶¶ 154–55, 200–03.) In the alternative, Plaintiff argues that if the liquidated damages clause is unenforceable or he otherwise is not permitted to recover the amount of the earnest money, then he is entitled to actual damages.

 Contrary to Plaintiff's argument, Defendants did not waive their arguments regarding the enforceability of the liquidated damages clause. See Paloian v. Grupo Serla S.A. de C.V. (In re GGSI Liquidation, Inc.), 351 B.R. 529, 596 (Bankr.N.D.Ill.2006). Plaintiff provides no authority for the assertion that Defendants have waived these arguments, and cannot argue that he was unaware of or surprised by Defendants' arguments. In Grupo Serla, the plaintiff-trustee was prohibited from raising new arguments in his post-trial proposed Findings of Fact and Conclusions of Law, because this would have resulted in unfair surprise in contravention of the purpose and policy behind the use of final pretrial orders. Id. Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. Id. (citing Gorlikowski v. Tolbert, 52 F.3d 1439, 1443–44 (7th Cir.1995) (noting that "[b]ecause the parties rely on the

pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial."); *see also Hartwick v. Craig (In re Craig)*, No. 03–A–4341, 2004 WL 1490427, at *1–3 (Bankr.N.D.Ill. June 29, 2004) (sanctioning debtor for failing to comply with final pretrial order); *SNA Nut Co. v. Haagen–Dazs Co.*, 302 F.3d 725, 732 (7th Cir.2002) (holding that "a defense not raised in a pretrial order is deemed waived")). Since the whole purpose of pretrial conferences and orders "is to clarify the real nature of the dispute at issue, a claim or theory not raised in the pretrial order should not be considered by the fact-finder." *Id.* (quoting *Gorlikowski*, 52 F.3d at 1444). But the foregoing precedents do not apply here, because the issue in question was actually raised in a submission filed by Defendants pursuant to the Final Pre–Trial Order.

The Final Pre–Trial Order dated April 11, 2007, and entered in this case required that the parties file separate pre-trial submissions rather than a single document submitted by all parties. It stated, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." Pursuant to that Order, the Defendants filed Amended Proposed Findings of Fact and Conclusions of Law on August 20, 2007, in which they raised the issue regarding the enforceability of the liquidated damages clause. Plaintiff clearly had notice that this would be an issue at trial. In fact, he was given the opportunity during trial to submit a supplemental brief on the subject, which he did on August 24, 2007. Thus, Defendants did not waive their right to challenge the enforceability of the liquidated damages clause.

 Under Illinois law, courts will enforce liquidated damages provisions in a real estate sales contract where it can be shown that: (1) the parties' intent was to agree in advance as to the settlement of damages that might arise upon breach of contract; (2) the amount provided as liquidated damages was reasonable at the time of contracting and it bears some relation to the actual damages which might be sustained; and (3) the actual damages would be difficult to prove. *Morris v. Flores,* 174 Ill.App.3d 504, 506, 124 Ill.Dec. 122, 528 N.E.2d 1013, 1014 (1988) (citing *Curtin v. Ogborn,* 75 Ill.App.3d 549, 31 Ill.Dec. 391, 394 N.E.2d 593, 598 (1979)). Defendants bear the burden of proving that a liquidated damages clause is unenforceable. *See, e.g., XCO Int'l Inc. v. Pac. Scientific Co.*, 369 F.3d 998, 1003 (7th Cir.2004).

██ Defendants have failed to carry their burden to show that the liquidated damages clause is an unenforceable penalty. First, the plain language of the liquidated damages clause quoted above shows that it was the parties intent to agree to settlement of damages in advance. Second, measuring damages as a percentage of total price in a contract for the purchase and sale of real estate is an acceptable method of setting liquidated damages, and five percent is well within the acceptable range of measurement. *See, e.g., Hajeck v. Wyrick,* 124 Ill.App.3d 210, 79 Ill.Dec. 573, 463 N.E.2d 1348, 1353 (1984) (earnest money deposit of less than ten-percent of selling price was not an undue amount and requiring forfeiture of same was not unjust). Finally, a liquidated damages clause was appropriate in this case, because it was foreseeable that actual damages might be difficult to prove due to the difficulty of finding a replacement buyer on short notice in an auction conducted through bankruptcy. (Douglass Trial Test.) The Trustee could not anticipate that he would later be able to negotiate three addendums to the Toulabi Agreement that significantly

mitigated his damages. Therefore, the $833,000 figure is found and held to be reasonable, and the liquidated damages clause is not an unenforceable penalty.

■ Second, the liquidated damages clause is not an unenforceable option between actual or liquidated damages, because it does not allow Plaintiff a choice of recovering liquidated damages or actual damages depending on a post-breach assessment of which measure of damages would be higher. It is established under Illinois law "that [when] a clause providing for the recovery of liquidated damages at the option of the seller in effect preserves the promisee's right to alternatively seek compensatory damages, the right to liquidated damages is rendered unenforceable." *Catholic Charities*, 251 Ill.Dec. 764, 741 N.E.2d at 657 (citing *Grossinger Motorcorp, Inc. v. American National Bank & Trust Co.*, 240 Ill.App.3d 737, 180 Ill.Dec. 824, 607 N.E.2d 1337 (1992)). However, the liquidated damages clause at issue here does not provide for such an option. The election that paragraph 17(B) of the Agreement refers to is the Trustee's choice to terminate the Agreement and "receive" liquidated damages or to seek specific performance. A liquidated damages clause that allows for liquidated damages or specific performance, which are both equitable remedies, is valid. *See Phillips v. Feldott*, No. 96–C–7131, 1998 WL 60906, at *5–6 (N.D.Ill. Feb.4, 1998). The operative language of the liquidated damages clause is the language providing "liquidated damages as its *sole and exclusive remedy*" if the monetary remedy is selected. (JX 13 at PT000731 ¶ 17(B) (emphasis added).) Thus, the liquidated damages clause is not unenforceable because it does not by its terms provide a specified option between liquidated damages or actual damages.

■ Nevertheless, Plaintiff is not entitled to recover the $833,000 as liquidated damages. Under Illinois law, "a seller of real property may not recover as liquidated damages sums which have not been paid by the buyer, absent a contrary provision." *Newcastle Properties, Inc. v. Shalowitz*, 221 Ill.App.3d 716, 164 Ill.Dec. 221, 582 N.E.2d 1165, 1171 (1991). In this case, Plaintiff never received the earnest money deposit. Kothari told Douglass on Friday, October 15, that RERM was not in a position to provide the earnest money deposit at the time of executing the Agreement. *See* Findings of Fact, *supra*, ¶ 57(a). Goldstein and Douglass, on behalf of the Trustee, agreed to accept the earnest money deposit in the form of a wire transfer by Tuesday, October 19, rather than immediate certified funds as required by the DRO. *Id.* at ¶ 57(b). Nevertheless, Douglass, at the behest of Goldstein, asked Kothari to bring to the signing, a personal check that would act as a "placeholder" to show the Mortgagee that the Trustee had satisfied the requirements of the DRO. *Id.* at ¶ 57(c). When Douglass, as the Trustee's agent, received the uncertified personal check written by Sava, then an unknown third party, he had no reason to believe that there were sufficient funds to honor the check. He did not check with the drawee bank to see if there was a balance in the account, and did not deposit the check. He did not do so because he knew the check was not backed by funds. The earnest money deposit was not wired subsequently and, therefore, was never paid or received.

Plaintiff attempts to distinguish *Newcastle Properties* on the basis that "the purchase agreement [in that case] established the amount of liquidated damages as the amount 'theretofore *paid*,' (emphasis added) shall be 'retained' by plaintiff, not the amount which would have been *payable* had plaintiff properly presented the letter

of credit." 164 Ill.Dec. 221, 582 N.E.2d at 1171. The court in *Newcastle Properties* left open the possibility that "a contract may be drafted in such a manner as to allow the forfeiture not only of a deposit actually made but, in addition, a deposit that was agreed to be made." *Id.* at 1170–71. Plaintiff argues that the liquidated damages clause in the present case was drafted to achieve this result.

According to the liquidated damages clause in this case, "seller may ... *receive* the Earnest Money as liquidated damages." (JX 13 at PT000731 ¶ 17(B).) Plaintiff argues that the present tense "receive" distinguishes the liquidated damages clause from the provision in *Newcastle Properties,* and proves that it was not the intent of the contracting parties here to limit the liquidated damages to monies "paid" or under the control of the Trustee. This argument is not convincing. The liquidated damages clause must be read in conjunction with the earnest money deposit clause. *Dasenbrock v. Interstate Restaurant Corp.,* 7 Ill.App.3d 295, 287 N.E.2d 151, 154 (1972) (quoting Restatement of Contracts § 235(C)) ("A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together."). According to the earnest money deposit clause:

> Freeborn [the Trustee's law firm] shall hold the Down Payment Deposit in accordance with the terms of the Bid Procedures. If the Purchaser is deemed to be the successful bidder, Freeborn shall deposit the Down Payment Deposit (the "**Earnest Money**") with Chicago Title Insurance Company (the "**Title Insurer**"), as escrowee (the "**Escrowee**"), to be held in an account bearing interest for the benefit of the Purchaser and pursuant to a strict joint order escrow. . . .

(JX 13 at PT000724 ¶ 3.) Douglass informed Kothari that RERM was the successful bidder before the Agreement was actually executed or any earnest money was deposited. Pursuant to terms of the Agreement, RERM's earnest money deposit, had it been tendered, would have been deposited into the escrow. Thus, "receive" in the liquidated damage clause does not mean that the Trustee had a right to receive liquidated damages from Defendants, but that once the offer was accepted and funds deposited were placed in escrow, breach by the Purchaser would authorize the Seller to receive those escrowed monies as liquidated damages. When read in conjunction with the earnest money deposit clause, it is clear that the word "receive" in the liquidated damages clause refers to monies which were to be deposited with the escrowee and, therefore, the holding in *Newcastle Properties* applies in this case.

Plaintiff responds that Defendants cannot rely on the fact that the Trustee never received the earnest money deposit and the holding in *Newcastle Properties,* because of RERM's "material first breach". Plaintiff relies on *McBride v. Pennant Supply Corp.,* 253 Ill.App.3d 363, 191 Ill. Dec. 457, 623 N.E.2d 1047, 1051 (1993), for the proposition that if "a party has *materially* breached a contract, he cannot take advantage of terms of the contract which benefit him . . . ." (Quoting *Robinhorne Construction Corp. v. Snyder,* 113 Ill. App.2d 288, 251 N.E.2d 641, 645–46 (1969)). Assuming *arguendo* that RERM's breach of the deposit requirement was material, the doctrine of material breach only discharged the Trustee from proceeding with a sale under the Agreement. *See Dragon Const., Inc. v. Parkway Bank & Trust,* 287 Ill.App.3d 29, 222 Ill.Dec. 648, 678 N.E.2d 55, 58 (1997) ("A party to a contract is discharge from his duty to perform where there is a material breach of the contract by the other

party.") (quoting *Susman v. Cypress Venture,* 187 Ill.App.3d 312, 134 Ill.Dec. 901, 543 N.E.2d 184, 187 (1989)).

The doctrine of "first breach" embodied in the holding in *McBride,* that the breaching party "cannot take advantage of *terms of the contract,*" does not change the requirements for enforcing a liquidated damages clause under Illinois law. In this case, Defendants' argument is based on Illinois precedent requiring, as a condition of keeping an earnest money deposit as liquidated damages, that the deposit actually be received unless the contract specifically provided for liquidated damages even when the deposit is not received. In this regard, Defendants do not rely on the Agreement to challenge the applicability of the liquidated damages clause and, therefore, the doctrine of "material first breach" does not apply. Thus, Plaintiff is not entitled to $833,000 in liquidated damages, because no deposit in good money was ever received by the Trustee.

■■■ Finally, Plaintiff alternatively argues that he did not have to possess the earnest money deposit in order to receive that amount as damages, because the liquidated damages clause created an independent obligation for RERM to pay the Trustee $833,000. In advancing this argument, Plaintiff contends that if a contracting party cannot recover under a liquidated damages clause because it never received the earnest money deposit, it can nevertheless recover the same amount as damages. But damages must be an amount proved to result from a breach, not a penalty to punish for nonperformance or as a means to secure performance. *Grossinger,* 180 Ill.Dec. 824, 607 N.E.2d at 1346 (citing *Builder's Concrete Co. v. Fred Faubel & Sons, Inc.,* 58 Ill. App.3d 100, 15 Ill.Dec. 517, 373 N.E.2d 863 (1978)). This notion that an earnest money deposit clause creates a separate

obligation to pay which can be treated as fixing the amount of damages smacks of seeking an unenforceable penalty used, not as a reasonable attempt to ascertain actual damages, but as a punishment for non-performance. The fact that actual damages of $150,739.71 was all that Plaintiff was able to prove (as shown in discussion that follows) supports this conclusion.

To recover the amount specified by the Agreement as possible liquidated damages, Plaintiff must either prove actual damages in that amount, or establish the requirements for recovering liquidated damages under Illinois law. He does neither.

### Count I: Computation of Actual Damages

■■■ Although the liquidated damages clause is unenforceable, Plaintiff is not without a remedy. If a liquidated damages clause in a real estate transaction is deemed unenforceable, then actual damages are recoverable by the innocent party. *See Grossinger,* 180 Ill.Dec. 824, 607 N.E.2d at 1347 (holding that when a liquidated damages provision is unenforceable the defendant is allowed to recover actual damages). The purpose of damages is to place the non-breaching party in the position he would have been had the contract been performed. *Jones v. Hryn Dev., Inc.,* 334 Ill.App.3d 413, 268 Ill.Dec. 259, 778 N.E.2d 245, 249 (2002). "Actual damages" are real and substantial damages in an amount awarded to a complainant in compensation for actual and real loss or injury. *Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.,* 371 Ill.App.3d 556, 308 Ill.Dec. 803, 862 N.E.2d 1006, 1009 (2006) (citing Black's Law Dictionary 390 (6th ed.1990)). "Consequential damages" are awarded for loss or injury that does not flow directly and immediately from the wrongful act of a party but are the consequences or results of such an act. *Hartford Accident & Indemnity Co. v.*

*Case Foundation Co.,* 10 Ill.App.3d 115, 294 N.E.2d 7, 14 (1973).

In *Hryn Dev., Inc.,* purchasers sued vendor for the return of earnest money deposit paid under a purchase and sale agreement for a house, and vendor counterclaimed for breach of contract and to retain the earnest money as liquidated damages. 268 Ill.Dec. 259, 778 N.E.2d at 246. The opinion upheld the trial court's decision that the liquidated damages clause was unenforceable, and found that the vendor did not suffer actual damages, because it was able to mitigate its damages by contracting with a third-party for a higher price thereby realizing a profit even after subtracting the costs of purchasers' breach. *Id.* at 248. In other words, the opinion considered not only losses that flowed from a breach, but also related offsetting costs and benefits. An analogous method of analysis was used by the experts for the parties here. In this regard, evidence was taken at trial as to five categories of possible damages: (i) the net difference in contract price between the RERM Agreement and Toulabi Agreement; (ii) amounts paid by the Mortgagee for repairing the building facade that were added to the secured loan; (iii) additional interest on the secured loan incurred by the Trustee; (iv) additional real estate tax prorations that the Trustee was responsible for when the closing did not occur on October 31, 2004; and (v) professional fees. However, there was much disagreement about how to quantify those damages and possible related offsets.

Expert testimony was offered by both parties on the issue of damages. Prior to trial, Defendants filed a Motion *in Limine* to Bar Testimony of John Hausmann, Plaintiff's expert witness. Motions *in limine* are generally disfavored on the theory that evidentiary issues, especially in a bench trial, should be taken up in their

proper context. *In re Stark,* 311 B.R. 750, 753 (Bankr.N.D.Ill.2004) (citing *Hawthorne Partners v. AT & T Techs., Inc.,* 831 F.Supp. 1398, 1400 (N.D.Ill.1993)). Therefore, Defendants' Motion was denied subject to a *Daubert* hearing when the witness was called to testify. At trial, a *voir dire* as to each of the parties' tendered experts was conducted, and their testimony was admitted under Rule 701 Fed.R.Evid. Each experts' report was admitted into evidence along with testimony. (*See* JX 94; Defendants Exhibit ("DX") 42(a).)

Hausmann, Plaintiff's expert, calculated the Trustee's damages to be $1,005,811. (*See* JX 94 § III.) That figure includes $203,840 for *estimated* "Third Party Carrying Costs", attributable primarily to attorneys' fees. (*Id.* § III ¶ 4.) Hausmann was not allowed to testify as to his opinion of the size or reasonableness of the Trustee's attorneys' fees (and those portions of his written report dealing with the same have not been considered), because he is not an expert in attorneys' fees and has no personal knowledge of the actual fees or work involved as evidenced by his use of the word "estimated." (*Id.* § IV ¶ 4.) Thus, his opinion as to the $1,005,811 must be reduced by $203,840. Hausmann made additional factual errors concerning the Addendums to the Toulabi Agreement and facade costs, that are not supported by the evidence.

John Pogacnik ("Pogacnik"), Defendants' expert, opined that the Trustee suffered no damages as a result of RERM's breach and, in fact, realized a net benefit of $79,600. Pogacnik also made factual errors as to facade costs, accrued interest, and proration of real estate taxes, that are not supported by the evidence.

■ In arriving at an amount for actual damages, the Court will employ the experts' methodology, but as discussed be-

low their reports are partly unreliable and some of the parties' arguments based on those conclusions cannot be accepted.[4] The evidence from these experts will be discussed below.

### Sale Price Comparison

The base purchase price negotiated in the Toulabi Agreement was $16,490,000, (JX 51 at PT000398 ¶ 2), compared with a total purchase price in the RERM Agreement of $16,600,000. *See* Findings of Fact, *supra,* ¶ 39. However, the Second Addendum, entered into by the Trustee and Toulabi, called for total additional consideration of $405,000 ($50,000 in exchange for a closing date after December 1, 2004, and $355,000 subject to a possible credit relating to mechanics liens to Purchaser at closing).[5] *Id.* at ¶ 90(b). According to Plaintiff, the $355,000 of additional consideration should not be included in measuring the net difference in contract price, because the Trustee would not have had to negotiate to clear the mechanics liens had the RERM Agreement closed on October 31, as planned.

The Trustee's position is contradicted by the Agreements. Under both the RERM and Toulabi Agreements, the Trustee was to provide "a recordable special warranty deed subject only to the exceptions on attached *Exhibit C,*" (JX 13 ¶ at PT 000724 ¶ 6(A), JX 51 at PT000398 ¶ 6(A)), "not to include monetary liens on the Property." (JX 13, Ex. C at PT 000737 ¶ 14; JX 51, Ex. C at PT000411 ¶ 14.) Mechanics liens were thereby not excepted from the requirement of delivery of clear title. Thus, under both Agreements the Trustee had to take action to deal with the mechanics liens. Because the RERM Agreement did not close, there is no evidence and it would be inappropriate to speculate regarding the amount of money that would have been necessary to clear the mechanics liens to close that sale, but Plaintiff concedes that "[u]nder the RERM Agreement, the mechanics' liens would have attached to the proceeds of sale." (Plaintiff's Revised FFCL at ¶ 125(1).) That would have reduced the net proceeds of the Trustee. Neither party sought to introduce evidence to show the cost of dealing with liens to close the RERM contract. But under the Second Addendum to the Toulabi Agreement, it is clear how the mechanics liens were to be treated under that contract. In negotiating the Toulabi Agreement, the Trustee was seeking a better deal than the one he had with RERM. (Goode Trial Test.) He was able to achieve this result; the parties engaged in negotiations that resulted in additional contract consideration totalling $405,000. The Trustee seems to suggest that the additional consideration should not be considered as a larger contract price to be used in calculating damages, because it relates to the mechanics liens. In calculating damages, it does not matter whether the intent of the parties in negotiating elements of the Toulabi Agreement price was to address mechanics liens or anything else. The Trustee received a benefit in real dollars as a result of the negotiated additional consideration. Thus, the total consideration for the Toulabi Agreement was $16,895,000, as recognized by the Chicago Title and Trust Company ("Chicago Title") disbursement

---

4. For purposes of this damages analysis, it is assumed that the closing costs would have been apportioned between the purchaser and seller the same way under the RERM Agreement and Toulabi Agreement. This assumption is consistent with the parties' experts' opinions. (*See* JX 94; DX 42(a).)

5. In his post-trial briefs, Plaintiff fails to account in calculations for the additional $50,000 in consideration for a closing date after December 1, 2004.

statement used in closing the Toulabi sale. (*See* JX 55 at PT000362.)

However, that total contract sale price must be adjusted for certain post-closing credits to the Purchaser, Toulabi. The Second Addendum established formulas and procedures as to mechanics liens and other matters by which Toulabi was to be entitled to a post-closing credit. Those procedures ultimately resulted in a $91,297.55 post-credit closing to Toulabi.

(*See* JX 56 at PT000365.) In order to arrive at the net difference in contract price one must compute the base purchase price of the Toulabi Agreement ($16,490,-000) plus the additional consideration ($405,000), and then subtract the related post-closing credits ($91,297.55), and then subtract the RERM Agreement purchase price of $16,600,000. Thus, as a result of the Toulabi Agreement, the Trustee received a net benefit of $203,702.45. *See* following chart:

| | |
|---|---|
| Toulabi Agreement—Base price | $16,490,000.00 |
| Second Addendum—additional consideration for closing after December 1, 2004 | $ 50,000.00 |
| Second Addendum—further additional consideration | $ 355,000.00 |
| Total consideration | $16,895,000.00 |
| Less Post-closing credits that offset additional consideration | ($ 91,297.55) |
| Net proceeds after credits | $16,803,702.45 |
| RERM Agreement price | $16,600,000.00 |
| NET DIFFERENCE—excess of Toulabi Agreement over RERM Agreement | $ 203,702.45 |

However, the Trustee incurred additional expenses as a result of Defendants' breach that were reasonably foreseeable and, therefore, properly chargeable against Defendants as consequential damages. Those include certain amounts for repairs to the building facade, additional interest charges, and real estate tax prorations.

### Facade Repairs

The City of Chicago had cited Polo Tower for certain Building Code violations regarding the building's facade. *See* Findings of Fact, *supra*, ¶ 90(c). On August 18, 2004, Bankruptcy Judge Goldgar entered an Order Modifying the Automatic Stay to allow the Mortgagee to proceed with necessary repairs to the building facade with expenses incurred to be added to the loan balance. (*See* JX 5, Ex. C at PT000759.) As of October 31, 2004 (when the RERM contract was to close), the Mortgagee had made three payments to-

taling $103,432.88 toward repairing the facade. (*See* JX 89 at PT000514.) Plaintiff argues that RERM would have been responsible for this amount because "it was receiving the benefit of these improvements." (Plaintiff's Revised FFCL at ¶ 125(2).) This argument is not based on the RERM Agreement or otherwise supported by the evidence. The RERM Agreement contained an "as-is" clause, (*see* JX 13 at PT000728–30 ¶ 15), so that Defendants would have been responsible only for the cost of repairing the facade after the RERM closing scheduled for October 31, 2004.

As of the Toulabi closing on January 18, 2005, the Mortgagee had made total payments of $289,409.78, which were passed through to the Trustee as part of the loan balance. *See* Findings of Fact, *supra*, ¶ 90(c). Haussmann testified that Plaintiff was damaged by the entire amount of the

cost of the facade repairs.[6] However, this does not account for the Third Addendum, which limited the Trustee's liability for facade repairs to $140,000. *Id.* at ¶ 90(c)(iv). Pursuant to the Third Addendum, Toulabi thereby agreed to pay $149,409.78 of the facade repairs incurred as of the closing date (total of $289,409.78 expended for repairs less $140,000 to be the burden of Trustee). Thus, Plaintiff was only damaged by the difference between the amount paid for the facade repairs at closing ($140,000) and the amounts it paid for those repairs as of October 31, 2004 ($103,432.88), or $36,567.12. *See* following chart:

| DATES OF PAYMENTS BY MORTGAGEE FOR FACADE REPAIRS | AMOUNT | |
| --- | --- | --- |
| 09/07/2004 | $20,000.00 | |
| 10/04/2004 | $20,000.00 | |
| 10/21/2004 | $63,432.88 | |
| Total expenditure by Mortgagee for facade repair prior to scheduled RERM closing scheduled for October 31, 2004 | | $103,432.88 |
| 11/08/2004 | $79,473.80 | |
| 11/29/2004 | $30,831.03 | |
| 12/21/2004 | $75,672.07 | |
| Total expenditures by Mortgagee as of Toulabi closing | | $289,409.78 |
| Limit of Trustee liability for facade repairs as per Toulabi Agreement | | ($140,000.00) |
| Trustee liability as of October 31, 2004 | | $103,432.88 |
| TRUSTEE'S NET DAMAGES AS TO FACADE REPAIRS | | ($ 36,567.12) |

### Mortgage Interest

The Toulabi Agreement closed on January 18, 2005. *See id.* at ¶ 90(c)(i). Normally, the seller, in this case the Trustee, would have been responsible for the interest charges and real estate taxes for the eighteen days between January 1, and January 18. However, pursuant to Addendum Three, the parties set December 31, 2004, as the date for the proration of taxes,

---

6. In addition, it was Hausmann's testimony that the Chicago Title disbursement statement contained an accounting error regarding the facade improvement that resulted in a $140,000 debit against the Trustee, which should also be included as damages. (Hausmann Trial Test.) According to Hausmann, this represents "double counting." (*See* JX 94 § IV ¶ 6.) This conclusion is a *non sequitur.* In fact, the only double counting is in Hausmann's report itself. At one point, he opines that the Trustee was damaged by the entire $289,409.78. (*See id.* at § III ¶ 2.) At another, he assumes that *"if* the obligations of the Seller were limited to $140,000 ..." then Chicago Title made an accounting error. (*See id.* at § IV ¶ 6 (emphasis added).) First, this is not an assumption, it is a *fact,* established by the Third Addendum to the Toulabi Agreement. Second, it was properly accounted for in the disbursement statement. At closing, the Trustee received a credit for $149,409.78 and a debit of $140,000, while Toulabi received a credit of $140,000 and a debit of $149,409.78, (*see* JX 55 at PT000362–33), which represents the sharing of costs embodied in the Third Addendum. Thus, Hausmann failed to account for the Third Addendum twice: first, by concluding that the Trustee bore the entire amount of the facade repair costs, and then by concluding that Chicago Title made an accounting error on the disbursement statement. This double counting by Hausmann resulted in an additional $392,842.66 to his analysis that should not properly be treated as damages due to RERM's breach of contract.

*id.* at ¶ 90(c)(ii), and Mr. Toulabi agreed to take responsibility for the per diem interest charges after January 1, 2005. *Id.* at ¶ 90(c)(iii). Thus, as a result of Defendants' breach, Plaintiff was damaged in the amount of the per diem interest charges and real estate tax prorations for the sixty-one days between the scheduled closing on October 31 through December 31.

There is little disagreement between the parties regarding the additional per diem interest incurred by the Trustee. Pogacnik calculated the additional interest expense using a per diem figure of $3,100 for fifty-nine days, or $182,900. However, the Court took judicial notice of the fact that there are sixty-one days between October 31, and December 31. In addition, according to the Third Addendum, interest was accruing at a per diem rate of $3,250. (JX 54 at PT000390 ¶ 4.) Thus, Plaintiff was damaged in the amount of additional per diem interest charges of $198,250 (i.e., 61 days × $3,250). (*See* JX 94 § III ¶ 3.)

### Real Estate Taxes

Similarly, the Trustee was responsible for additional real estate taxes as a result of Defendants' breach. In his analysis, Pogacnik, "assumed that the [sic] RERM, LLC would have received the same tax proation [sic] as Purchase Agreement No. 2 regardless of when closing occurred." (DX 42(a).) This assumption is incorrect. Had the RERM Agreement closed on October 31, 2004, Defendants would have been responsible for the real estate taxes between closing and December 31. Thus, Plaintiff was damaged in the amount of these additional real estate taxes. Hausmann measured the tax damages by dividing the 2003 tax bill ($385,872) by 366, the number of days per year (2004 was a leap year, and dividing the previous year's tax bill by 366 rather than 365 provided a small benefit to Defendants). (Hausmann Trial Test.) Thus, the per diem tax ex-

pense was $1,054.30. (*Id.*) He then multiplied this number by sixty-one, which equals $64,312 (i.e., 61 × $1,054.30). (*Id.*) Thus, Plaintiff was damaged in the amount of additional real estate taxes of $64,312. (*See* JX 94 § III ¶ 5.)

### Attorneys' Fees

Finally, Plaintiff argues that the Trustee was damaged as the result of attorneys' fees that he incurred directly or indirectly as a result of Defendants' breach. After trial, the parties entered into a Stipulation regarding the fees charged by Freeborn & Peters, counsel for the Trustee, as a result of Defendants' breach. That Stipulation limited Plaintiff's damages for attorneys' fees charged by that firm to $55,312.50.

But that stipulation does not put the issue of attorneys' fees to rest. Plaintiff also argues that he was indirectly damaged by attorneys' fees paid to attorneys for DJM that were passed through to the Trustee. According to Plaintiff:

> Under the Court's Designation Rights Order, DJM was entitled to reimbursement of its expenses, including attorneys' fees.... DJM also had to deal with the lender's assertion that it could proceed with foreclosure and had to address issues concerning the payoff letter, including filing an adversary action against the Mortgagee (since the Mortgagee was recalcitrant in providing information due to the Defendants' default).

(Trustee's Revised FFCL at 94–95 ¶ 4(ii).) This argument as to DJM attorneys' fees fails for several reasons.

First, while absolute certainty as to the amount of loss or damages is not required to justify recovery, a plaintiff must establish a reasonable basis for computation. *Daniggelis v. Pivan*, 159 Ill. App.3d 1097, 111 Ill.Dec. 846, 513 N.E.2d 92, 96 (1987). Plaintiff has not provided

admissible evidence of the attorneys' fees actually incurred by DJM and that can be attributed to the breach of contract. Douglass' testimony regarding DJM's attorneys' fees incurred as the result of ongoing litigation with Mortgagee was stricken from the record as inadmissible. Similarly, Hausmann was not allowed to give his opinion regarding attorneys' fees. *See* Conclusions of Law, above. The DJM attorneys were not called as witnesses to give details as to their work so as to enable a justified finding as to their fees and an apportionment of those fees as a consequence of the breach. Therefore, any damage award for DJM's attorneys' fees would, on the present record, be speculative, and is not allowed.

■ Second, in order to recover consequential damages, it must reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof. *See Zielinski v. Miller,* 277 Ill.App.3d 735, 214 Ill.Dec. 340, 660 N.E.2d 1289, 1293 (1995). While Defendants may have reasonably contemplated that the Trustee would incur some attorneys' fees as a result of a breach, they could not anticipate that DJM and the Trustee would run up those fees through the use of a worthless check and other arguments used in state court litigation to delay the Mortgagee from pursuing its foreclosure suit.

Douglass continued to pursue a deal with RERM even though the deadline for submitting bids had passed, and the automatic stay was set to expire on October 17, 2004. *See* Findings of Fact, *supra,* ¶¶ 29–31. On Friday, October 15, Kothari told Douglass that RERM was not in a position to provide the earnest money deposit. *Id.* at ¶ 57(a). Also on October 15, Goldstein and Douglass spoke with Kothari and his attorney, Murphy, and agreed to accept the earnest money deposit by wire transfer on October 19. *Id.* at ¶ 57(b). They made this agreement despite the fact that Exhibit C of the DRO required the Trustee "procure both a sale contract and Qualifying Deposit … by October 17, 2004." (JX 5 at PT000759.) Thus, in order to prove to the Mortgagee that the Trustee had secured a "Qualifying Deposit", Douglass accepted a personal check signed by Sava, an individual who he had never met. *See* Findings of Fact, *supra,* ¶ 44. It has been found that the Trustee, through his agent, knew that there were insufficient funds to honor the check that was tendered as a "placeholder" for the earnest money deposit. The agent never checked with the drawee bank as to the account balance, or deposited the check. Nonetheless, the Trustee used the worthless check to stall the Mortgagee in its state court foreclosure lawsuit, and now he wants Defendants to pay the cost of using attorneys to do so. DJM also accused the Mortgagee of failing to provide an accounting and payoff letter in compliance with the DRO, and brought an Adversary Complaint against them. *See* Findings of Fact, *supra,* ¶¶ 82–86. At the time of signing the Agreement, Defendants could not have contemplated that the attorneys' fees incurred in defending the foreclosure and prosecuting that Adversary proceeding would be an element of damages for a breach.

Finally, even assuming *arguendo* that the DJM attorneys' fees could have been contemplated by the parties and were not speculative, there is evidence that DJM recovered its attorneys' fees incurred in the Adversary proceeding from another source. According to the Adversary Settlement, DJM received $75,857.58 in attorneys' fees from the Mortgagee. *See* Findings of Fact, *supra,* ¶ 88. Plaintiff cannot

recover the same damages from two sources.

For the foregoing reasons, the fees charged by DJM attorneys are not properly chargeable to Defendants as damages for RERM's breach.

### Pre–Judgment Interest on Count I

██ Under Illinois law, the Plaintiff–Trustee is entitled to pre-judgment interest on the damages awarded in Count I. *See* 815 ILCS 205/2 ("Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing. . . ."). A contract for the sale of realty qualifies as an "instrument of writing" under the statute. *Farwell Construction Co. v. Ticktin,* 84 Ill.App.3d 791, 39 Ill.Dec. 916, 405 N.E.2d 1051, 1064–65 (1980) (citing *Vandercook v. Mayer,* 297 Ill.App. 311, 17 N.E.2d 542 (1938)). Pre-judgment interest will be awarded on the damages in Count I subject to exact computation. *Id.* Five percent of $150,739.17 is $7,536.96 per year, or $20.65 per day. Thus, Plaintiff is entitled to per diem pre-judgment interest of $20.65 between October 26, 2004, when the Agreement was terminated and entry of judgment.

### Conclusion as to Count I

It is found and held that RERM breached the Purchase and Sale Agreement, and judgment will be entered in favor of Plaintiff–Trustee against RERM. Plaintiff was damaged by RERM's breach, and is entitled to recover actual and consequential damages of $150,739.71 on Count I of the Adversary Complaint calculated as set forth in the following chart, plus prejudgment interest to be calculated:

| *Source of Damages* | *Amount* |
|---|---|
| Net contract price difference (Comparing RERM and Toulabi Agreements) | $203,702.45 |
| Net facade repair costs | ($ 36,567.12) |
| Per diem mortgage interest after October 31, 2004 | ($198,250.00) |
| Real Estate Tax proration after October 31, 2004 | ($ 64,312.00) |
| Freeborn & Peters attorneys' fees | ($ 55,312.50) |
| TOTAL NET DAMAGES (before adding prejudgment interest, and attorneys' fees if awarded under the Agreement) | ($150,739.17) |

### Count IV: Alleged Fraudulent Misrepresentations

██ Under Illinois law, the elements of fraud include: (1) a false statement of material fact; (2) the defendant's knowledge or belief that the statement was false; (3) intent to induce the other party to act; (4) the other party's justifiable reliance upon the statement; and (5) damage resulting from such reliance. *Kapelanski v. Johnson,* 390 F.3d 525, 530–31 (7th Cir. 2004); *Soules v. Gen. Motors Corp.,* 79 Ill.2d 282, 37 Ill.Dec. 597, 402 N.E.2d 599, 599 (1980). Plaintiff argues that Kothari made and was responsible for a number of alleged misrepresentations and omissions regarding the source of the funds for the purchase of Polo Towers, the identity of the purchaser, and the validity and timing of such funding. These alleged misrepresentations include the following:

1. On October 5, 2004, Kothari told Douglass, during a telephone conversation, that he had control over the funds for the escrow deposit for Polo Tower in the United States. (Douglass Trial Test.; *see also* JX 7.)

2. On October 5, 2004, Kothari told Douglass, during a telephone conversation, that he had control over the funds

for the purchase of Polo Tower overseas at the Hong Kong Singapore Bank ("HSBC Bank"). (Douglass Trial Test.)

3. On October 5, 2004, during a telephone conversation and during several subsequent conversations, Kothari represented to Douglass that he was going to purchase Polo Tower. (*Id.*) At trial, Kothari testified that the true purchasers of Polo Tower was a John Murdoch and John Sites, and an entity to-be-formed. (Kothari Trial. Test.)

4. On October 5, 2004, when inquiring about Polo Tower, Kothari told Douglass that he was associated with Sphinx Chicago Properties. (Douglass Trial Test.; *see also* JX 7.) Kothari eventually signed the Purchase and Sale Agreement on behalf of RERM. (JX 13.) Prior to signing the Purchase and Sale Agreement, Kothari never mentioned RERM to the Trustee's agents. (Douglass Trial Test.)

5. On October 5, 2004, and all times thereafter, Kothari falsely represented that Murdoch agreed to purchase Polo Tower. (Douglass Trial Test.; Kothari Trial Test.)

6. On October 16, 2004, Kothari tendered a check for which he knew there was not valid funds. (Kothari Trial Test.)

7. On October 16, 2004, Kothari represented that there were good funds tendered for the deposit check, (Douglass Trial Test), but there were no funds to support the deposit check. (Douglass Trial Test.; Kothari Trial Test.; Sava Trial Test.)

8. On October 16, 2004, Kothari falsely represented that he would be able to close the Polo Tower transaction within 15 days. (Douglass Trial Test.; *see* JX 13.)

9. On October 16, 2004, Kothari falsely advised Douglass that the funds for the escrow deposit would be wire trans-ferred the Monday or Tuesday after the Purchase and Sale Agreement was executed. (Douglass Trial Test.; Kothari Trial Test.)

10. On October 20, 2004, Kothari, through his agent, Murphy, told Douglass that funds for the earnest money deposit had been wired from the HSBC Bank to the Bank of New York. (*See* JX 25.)

11. On October 21, 2004, Kothari told Douglass that he spoke to Murdoch and a representative from the Bank of New York and confirmed that funds for the earnest money deposit were located at the Bank of New York. (*See* JX 27; Douglass Trial Test.) Despite Douglass's request, Kothari failed to provide Douglass with a contact at the Bank of New York to independently confirm that the funds were present. (Douglass Trial Test.)

12. On November 12, 2004, Kothari, through his agent Murphy, stated that funds for the Polo Tower deposit were delayed due to clearance issues. (*See* JX 31.)

(*See* Plaintiff's Revised FFCL at ¶ 72(i)-(xii).)

The evidence relating to the foregoing allegations and events fails to establish a claim for fraud, because it is found and held that they do not constitute misrepresentations of material fact, or that Plaintiff and his agents could not or did not justifiably rely on them.

Regarding the October 5, telephone conversation, it is found that the evidence does not support that Kothari ever made these alleged misrepresentations. During a telephone conversation on October 5, Douglass and Kothari discussed the purchase price, and contract terms, including a financing contingency and sixty-day closing. (*See* JX 7 at PT000004; Douglass

Trial Test.). In addition, Douglass' Telephone Contact Sheet contains the handwritten note: "U.S. Gov't. under Patriot Act. Coming from Hong Kong. HSBC." (JX 7.) That corroborated defense evidence as to the source and timing of the earnest money deposit. Moreover, Douglass gave conflicting testimony at his deposition and at trial regarding the alleged misrepresentation concerning the source of the earnest money funds. *See* Findings of Fact, *supra*, ¶ 51. Initially, he testified that he could not remember if Kothari told him that the earnest money and closing funds were coming from separate sources, and that the earnest money funds were already located in the United States. *Id.* Then, after reviewing a November 12, email drafted by Goldstein, Douglass changed his testimony, and said that Kothari represented, during the October 5, conversation, that the earnest money funds were located domestically. *Id.* At trial, Kothari testified that he did not tell Douglass that the earnest money funds were coming from a domestic source during the October 5, conversation. (Kothari Trial Test.) Plaintiff did not recall Douglass to the stand to rebut Kothari's testimony. *See* Findings of Fact, *supra*, ¶ 58.

It is found that Kothari's credible testimony and Douglass' conflicting testimony is significant evidence on this subject. This finding is supported by Douglass' contemporaneous notes that indicate that the financing was coming from Hong Kong. Rather, the first time that Plaintiff was told that the earnest money funds were located within the United States was October 20, after the Agreement was signed, when Murphy sent Goldstein an email stating: "The funds have been wired from the Hong Kong Bank to the Bank of New York. . . . My client is in the process of tracing the wire to the Bank of New York. I have been assured that the wire will hit my Firm's account today." *Id.* at ¶ 68, 70.

Thus, evidence involving the October 5, telephone conversation does not support a claim for fraud.

Similarly, the evidence that Kothari represented during the October 5, conversation that he controlled funds held at the HSBC Bank is inconclusive at best. At trial, Kothari testified that during the October 5, conversation he advised Douglass that he had an investor interested in Polo Tower, and could obtain financing if the property was available. (Kothari Trial Test.) He testified that he did not tell Douglass that Defendants controlled the funds. (*Id.*)

 Furthermore, even if Kothari made this representation, the Trustee's agents *could not justifiably rely on it*. The Polo Tower Bid Procedures required all bids to:

> [I]nclude information regarding (i) the identity of the bidder and all contact information for an officer or agent of the bidder, and (ii) the bidder's present financial condition, including the bidder's ability to consummate the purchase, and (iii) the bidder's operational history. . . .

*See* Findings of Fact, *supra*, ¶ 26(b). Implicit in this provision was DJM's obligation to make a due diligence effort to verify any financial information provided by a prospective purchaser. *See id.* at ¶ 32. DJM clearly did not do so. Douglass testified that he either did not or could not ascertain RERM's financial condition, because no information was available to establish that condition. (Douglass Trial Test.) Plaintiff argues that DJM retained the right to modify or waive provisions of the Bid Procedures, *id.* at ¶¶ 26(e), 42, and therefore, was not bound by any due diligence requirement. If the Trustee wanted to excuse DJM from doing its job in this regard, he could do so. On the other hand, DJM and the Trustee cannot waive

the requirement of justifiable reliance, which is an element of proof for establishing fraud. The Trustee allowed his agent, DJM, to disregard its duty of due diligence in investigating RERM's financial ability in order to get a contract in time to checkmate the Mortgagee. That fact now checkmates the Trustee in his effort to claim justifiable reliance on RERM's ability to pay the earnest money and close the transaction.

Although it is true that a plaintiff's negligence is not a defense to fraud, see *Roda v. Berko*, 401 Ill. 335, 81 N.E.2d 912, 916 (1948), this principle coexists uneasily with the requirement that the plaintiff justifiably rely on the alleged misrepresentation. *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041 (7th Cir.1990) (citing *Chicago Title & Trust Co. v. First Arlington National Bank*, 118 Ill.App.3d 401, 73 Ill.Dec. 626, 454 N.E.2d 723, 728–29 (1983); *Luciani v. Bestor*, 106 Ill.App.3d 878, 62 Ill.Dec. 501, 436 N.E.2d 251, 256 (1982)). Whether there was justifiable reliance is based on the totality of the circumstances. *Central States Joint Bd. v. Continental Assur. Co.*, 117 Ill.App.3d 600, 73 Ill.Dec. 107, 453 N.E.2d 932, 936 (1983) (citations omitted). The following factors are relevant to this analysis: information in plaintiff's possession that should have put plaintiff on inquiry, ease of access to outside information and relative sophistication of parties, whether facts were such as to put reasonable person on inquiry, and whether the party making the statement creates a false sense of security or blocks further inquiry. *Teamsters Local 282 Pension Fund v. Angelos*, 649 F.Supp. 1242, 1249–50 (N.D.Ill.1986).

The negotiations between Kothari and Douglass were arm's-length discussions between two sophisticated parties. Douglass testified at trial that he had discussions with Kothari about Mr. Murdoch, RERM's alleged financing source for the project, before entering into the Agreement. (Douglass Trial Test.) Thus, Douglass knew that the funds to purchase Polo Tower were coming from a source who was not a party to the Agreement, and he learned that there may have been Patriot Act restrictions on transferring the money from abroad. All that should have put him on notice to proceed with caution. However, the Trustee was operating under a deadline, and decided it was more important to secure a contract in order to stall the Mortgagee than to conduct due diligence as to RERM. "A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another." *Central States Joint Bd.*, 73 Ill. Dec. 107, 453 N.E.2d at 936. Douglass admitted that DJM was responsible for qualifying bidders, yet he was unable to find out any information about RERM or independently verify the existence or role of Mr. Murdoch beyond his discussions with Kothari. (Douglass Trial Test.) His rational for proceeding with the transaction was, "Anyone putting up $833,000 was a serious buyer." (Douglass Trial Test.), a most bizarre rationale in light of the fact that the earnest money deposit was never made. Having failed to conduct any due diligence in order to determine RERM's financial condition and knowing that due diligence information was not available, and having accepted the strange, unsecured check from Sava's firm without ever checking to see if it was backed by bank deposits, the Trustee and his agents could not justifiably rely on Kothari's asserted statements concerning funding even if they are assumed to have occurred and could be viewed as misrepresentations.

Plaintiff further argues that Kothari misrepresented the entity on whose

behalf he was negotiating and which became the contract purchaser of Polo Tower. In the absence of a fiduciary relationship or other circumstances giving rise to a duty to disclose, a purchaser owes no duty to the seller to disclose that he or she is not the real party in interest, but is acting for others; accordingly, the purchaser in such case owes no duty to disclose the real purchaser. *See* 37 Am.Jur. Frud and Deceit § 48. No such duty existed here.

 In addition, there is no evidence that the identity of the purchaser was material to the Trustee before the Agreement was signed. "A misrepresentation is 'material' if it is such that had the other party been aware of it, he would have acted differently." *Brown v. Broadway Perryville Lumber Co.,* 156 Ill.App.3d 16, 108 Ill.Dec. 593, 508 N.E.2d 1170, 1176 (1987) (citing *Mack v. Plaza Dewitt, Ltd. Partnership,* 137 Ill.App.3d 343, 92 Ill.Dec. 169, 484 N.E.2d 900 (1985)). Douglass knew that Kothari operated at least one other LLC, Sphinx Chicago Properties. In fact, Douglass testified at his deposition that he assumed that one reason he could not find more information about RERM is that it is common in the real estate industry for the corporate owner to be established after the transaction is consummated. (Douglass Dep. Test. 148:9–13.) Thus, there is no evidence that the identity of the ultimate purchaser was material to the Trustee before the Agreement was signed, and Kothari did not have a duty to disclose RERM during negotiations.

 Kothari tendered the worthless check for earnest money to Douglass no later than October 18. *See* Finding of Facts, *supra,* ¶ 48. There were insufficient funds to honor the check at the time it was tendered. *See id.* at ¶ 57(f). Plaintiff cites *Hickory Point Bank & Trust, FSB v. Josef Kucera (In re Kucera),* 373 B.R. 878 (Bankr.C.D.Ill.2007) for the prop-

osition that tendering the check when it was known that there were insufficient funds to honor it is fraud in and of itself. However, *Hickory Point* holds the exact opposite:

A check is not a factual assertion; a check merely directs the drawee bank to pay the face amount of the check to the bearer. *Williams v. U.S.,* 458 U.S. 279, 284–86, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982); *In re Scarlata,* 979 F.2d 521, 525 (7th Cir.1992). Therefore, the presentation of a bad check alone does not constitute a false representation, false pretenses, or fraud which would be nondischargeable under § 523(a)(2)(A). *In re Trevisan,* 300 B.R. 708, 716 (Bankr. E.D.Wis.2003). A plaintiff must prove that the debtor made an express representation that the check was good other than the issued check itself. *Id.* at 717.

*Id.* at 883–84. Plaintiff argues that Kothari made an express representation regarding the validity of the check, but this allegation is not supported by the preponderance of evidence. *See* Finding of Facts, *supra,* ¶ 57. Rather, it is found that Kothari told Douglass on October 15, that RERM did not have funds with which to make the earnest money deposit. *Id.* When Kothari tendered the check, it was not in certified funds as required by the Polo Tower Bid Procedures, *Id.* at ¶ 45, but rather was a personal check drawn on an account in the name of an individual Douglass had never met. *Id.* at ¶ 44. Without an express representation as to the check's validity, and given the additional facts that should have put Douglass on inquiry, it is found that there was no misrepresentation or, if there was, the Trustee and his agents could not justifiably rely on it.

 Kothari's alleged misrepresentations regarding RERM's ability to close within the fifteen days as required by the

Agreement, and the promise of earnest money funds by wire transfer do not constitute actionable fraud, because they were statements about future conduct. "[M]isrepresentations of intention to perform future conduct, even if made without a present intent to perform, do not generally constitute fraud...." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (1989). However, Illinois law recognizes an exception under which "promissory fraud" is actionable if the false promise is part of a scheme employed to accomplish the fraud. *Id.* An actionable scheme of promissory fraud will exist where a defendant either (1) lied repeatedly to a single promisee, or (2) lied at least once to multiple promisees. *Calvin v. The Leitner Thomas Group,* No. 00–C–8055, 2003 WL 1720008, at *4 (N.D.Ill. Mar.31, 2003). "A plaintiff asserting a promissory fraud scheme must surmount a 'deliberately high' burden." *The Leitner Thomas Group,* 2003 WL 1720008, at *4 (citing *Bower v. Jones,* 978 F.2d 1004, 1011 (7th Cir.1992)).

■ Plaintiff has failed to establish a "scheme" to defraud him. Kothari testified that at the time the Agreement was executed, he believed that the wire transfer would be forthcoming to cover the earnest money deposit and that RERM could close the transaction within fifteen days. (Kothari Trial Test.) Having failed to conduct any due diligence regarding RERM's supposed source of financing, Plaintiff now suggests that Kothari's investor, Murdoch, was a figment of Kothari's imagination. (*See* Trustee's Revise FFCL at 51–52 ¶¶ 83–84.) Plaintiff goes so far as to suggest that it was Defendants' burden to obtain an affidavit or depose Murdoch in order to corroborate his involvement in the transaction. (*See id.* at 51 ¶ 83.)

The term "burden of proof" has two meanings. *Donovan v. St. Joseph's Home,* 295 Ill. 125, 131, 129 N.E. 1 (1920). It commonly refers to which party has the burden of establishing the elements to support a *prima facie* case for relief. *Id.* That burden never shifts. *Id.* It also refers to which party has "the duty of establishing the truth of a given proposition or issue by such a quantum of evidence as the law demands in the case in which the issue arises." *Id.* That burden shifts between the parties, and rests with the party against whom a decision would be made if no further evidence were presented to rebut the opponent's evidence. *Auburndale State Bank v. Dairy Farm Leasing Corp.,* 890 F.2d 888, 893 (7th Cir.1989); *St. Joseph's Home,* 295 Ill. at 130, 129 N.E. 1.

Kothari testified that Murdoch toured Polo Tower on a visit to Chicago in September 2004. *See* Findings of Fact, *supra,* ¶ 19. In addition, Kothari was in communication with Murdoch on at least four occasions between October 15, when Douglass informed Kothari that RERM was the successful bidder, and October 16, when the Agreement was executed. (*See* JX 42 at RERM0035–37.) During these conversations, Kothari and Murdoch discussed the need for a wire transfer to replace the $833,000 "placeholder" check, and the fact that HSBC did not have a correspondent bank in Chicago so that the wire transfer would take two to three days to complete. *Id.* Having testified as such, Defendants did not have any further duty to corroborate Murdoch's involvement, and the burden of disproving Murdoch's existence shifted to Plaintiff. The preponderance of evidence does not show that Kothari did not intend to keep these promises, and it is found and held that he had some basis to believe that he could do so. Therefore, there was no scheme to defraud and the statements about future conduct are not actionable as fraud.

 Additional statements supposedly relied on after the Agreement was executed on October 16, 2004, could not have acted to induce the Trustee to enter into the contract with RERM. At the most, Kothari's alleged misrepresentations after the Agreement was executed may have acted to delay the Trustee from declaring a breach, terminating the Agreement, and seeking a replacement buyer sooner than he did. It is clear that Trustee could have terminated at any time after RERM failed to come up with earnest money. The Trustee did put Defendants on notice of his intention to terminate the contract on October 25, 2004, when he advised Defendants that if the earnest money deposit was not tendered by the following day he would pursue all of his remedies against them. (*See* JX 16 at PT000835.) The money did not come, so the Agreement was terminated on Tuesday, October 26. *See* Findings of Fact, *supra*, ¶ 76.[7]

 Even if one were to assume *arguendo* that Kothari's post-Agreement statements regarding the timing and location of the earnest money deposit funds were misrepresentations of material fact on which the Trustee justifiably relied, he did not suffer any damages from these statements. A defrauded party is entitled to be placed in the same financial position as he would have been in had a misrepresentation in fact been true. *Martin v. Allstate Insurance Co.*, 92 Ill.App.3d 829, 48 Ill.Dec. 316, 416 N.E.2d 347, 352 (1981). Generally, the measure of damages for

fraud is such an amount as will compensate the plaintiff for the loss occasioned by the fraud, or the amount which plaintiff is actually out of pocket by reason of the transaction. *Broadway Perryville Lumber Co.*, 108 Ill.Dec. 593, 508 N.E.2d at 1176 (citing *Martin*, 48 Ill.Dec. 316, 416 N.E.2d at 352). However, in an action for fraud, damages may not be predicated on mere speculation, and must be a proximate, and not remote, consequence of the fraud. *Id.* (citing *Shah v. Chicago Title & Trust Co.*, 119 Ill.App.3d 658, 75 Ill.Dec. 357, 457 N.E.2d 147, 151 (1983)).

Here, the alleged harm was the Trustee's decision to delay a few days in declaring a default and terminating the Agreement. Any claims of damages resulting from that short forbearance are based on the assumption that the Trustee would have found a replacement buyer sooner but for Kothari's alleged misrepresentations. The alleged misrepresentations occurred on October 19 and 20, *see* Findings of Fact, *supra*, ¶¶ 65–69, the Trustee declared a default on the following Monday, October 25, and the Agreement was terminated on October 26. *Id.* at ¶¶ 75–76. Douglass testified that there was no readily identifiable replacement buyer at the that. (Douglass Trial Test.) Thus, the additional six days between Kothari's alleged misrepresentations and termination did not affect the Trustee's ability to find a replacement buyer and, therefore, any measure of damages allegedly suffered

---

7. Under Illinois law, if a contract does not specify either the form or the content of an affirmative act necessary to exercise the option of terminating the agreement, the court must adopt a reasonable construction of the termination provision of the agreement. *Chart House, Inc. v. Maxwell*, 40 B.R. 231, 235 (N.D.Ill.1984). Sufficient notice to terminate a contract is that which clearly discloses to persons of ordinary intelligence what is intended. *Paradise v. Augustana Hospital and Health Care Center*, 222 Ill.App.3d 672, 165 Ill.Dec. 147, 584 N.E.2d 326, 328 (1991) (also noting that it is not required that adequate written notice specifically contain the word "termination"). The Agreement does not set forth the form or content of the termination notice. Therefore, reasonable construction of the termination provision must be used, and termination was effected on October 26, by the October 25, letter.

would be too speculative or not the proximate result of the alleged fraud.

██ Finally, Plaintiff argues that Kothari continued to misrepresent the forthcoming arrival of the earnest money deposit by wire transfer as late as November 12. However, these allegations do not satisfy the fourth element of a claim for fraud that plaintiff was induced to act based on justifiable reliance on a misrepresentation. The Agreement was terminated on Tuesday, October 26. Thus, any acts undertaken by the Trustee after that date could not have been taken based on his justifiable reliance on any statement by Kothari or other Defendants.

### Count IV: Alleged Fraudulent Omissions

Plaintiff alleges a series of omissions, which mirror the alleged misrepresentations, and can be grouped in three general categories, including that Kothari failed to disclose: (1) the true identify of the purchaser and Defendants' plan for generating a profit from the property; (2) the financial and operational history of RERM, and its financing source for the transaction; and (3) the status of the wire transfer for the earnest money funds and RERM's inability to close the transaction. Because these factual allegations arise from the same general conduct, the legal conclusions are similar to those above regarding the alleged fraud. It is found and concluded that the alleged omissions do not constitute fraud, because Defendants did not have a duty to speak and the Trustee could not justifiably rely on such omissions.

██ Failure to volunteer information does not constitute fraud. *Zanbetiz v. Trans World Airlines, Inc.*, 72 Ill.App.2d 192, 219 N.E.2d 98, 103 (1966). In order for the concealment of facts to constitute fraud, it must be shown to have been done under circumstances creating an opportunity and a duty to speak. *See Warner v. Lucas*, 185 Ill.App.3d 351, 133 Ill.Dec. 494, 541 N.E.2d 705, 707 (1989). Plaintiff has not shown that Defendants owed him a duty to speak, and it is held that they did not. Kothari and Douglass were dealing with each other in an arm's-length transaction. Kothari may have been motivated in part as a result of his personal relationship with the Guptas, but the preponderance of evidence does not show that he was acting as their agent in brokering a deal. Moreover, Defendants did not owe the Trustee a fiduciary duty and, therefore, they had no duty to disclose the identity of the purchaser or Defendants' plans for operating or "flipping" the property for a quick profit.

Moreover, the Trustee could not reasonably rely on Kothari's failure to disclose additional information about RERM, because as earlier discussed Douglass admitted that he failed to conduct due diligence to ascertain Defendants' financial ability, which was the Agent's duty. Thus, the Trustee knowingly accepted the risk of dealing with a shell company.

██ Finally, a duty to speak may arise when a statement was true when made, but a material change has taken place which renders the original statement false, and the person making such statement knows or should know that another party has relied on the original representation. *See St. Joseph Hospital v. Corbetta Const. Co., Inc.*, 21 Ill.App.3d 925, 316 N.E.2d 51, 71 (1974). Plaintiff contends that Defendants committed fraud by failing to disclose the status of the wire transfer for the earnest money deposit, or that it was not in fact coming. However, by the Trustee's own evidence, Kothari kept him apprised of the status of the wire transfer between October 16, when the

Agreement was executed, and October 26, when it was terminated. *See* Findings of Fact, *supra,* ¶¶ 65–72. The Trustee was told in these discussions that the wire transfer was forthcoming but was delayed due to "clearance issues" under federal law. It cannot be inferred from the fact that the wire transfer did not materialize that Kothari knowingly lied, or omitted or failed to disclose any material information. As discussed above, those affirmative representations do not constitute fraud, because they related to future conduct after the Agreement was signed. Moreover, the Trustee had no other credible buyer and was not shown to be harmed by his delay of a few days in terminating the Agreement.

### Conclusions as to Count IV

For the foregoing reasons, it is found that Defendants are not liable for fraud and judgment on Count IV will be entered in favor of Defendants.

### Count II and III: Alter Ego Liability

Having dealt with a shell company without engaging in due diligence to determine its viability, and having used the RERM Agreement to delay foreclosure by the Mortgagee, the Trustee seeks in Counts II and III to find deep pockets from whom to recover the damages for the RERM breach.

Plaintiff contends that Kothari and Sava should be held personally liable for the damages sustained as a result of RERM's breach of contract, based on a theory of alter ego liability.

 The general rule in Illinois, as in many jurisdictions, is that a corporation is a legal entity that exists separate and distinct from its shareholders, officers, and directors, who therefore are not generally liable for the corporation's obligations. *Itofca, Inc. v. Hellhake,* 8 F.3d 1202, 1204 (7th Cir.1993); *Gallagher v. Reconco Builders, Inc.,* 91 Ill.App.3d 999, 47 Ill. Dec. 555, 415 N.E.2d 560, 563 (1980). However, a corporate entity will be disregarded and the veil of limited liability pierced if the veil is an obstacle to the protection of private rights or if the corporation is merely the alter ego or business conduit of a dominating personality. *Gallagher,* 47 Ill.Dec. 555, 415 N.E.2d at 563. Two elements must be met in order to "pierce the corporate veil": (a) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (b) circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Id.* Factors assessed in order to determine whether the first element is present are, among others: inadequate capitalization, failure to issue stock, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation, non-functioning of officers and directors, absence of corporate records, commingling of funds or assets, and the treatment by an individual of the assets of the corporation as his own. *Id.; Van Dorn Co. v. Future Chemical and Oil Corp.,* 753 F.2d 565, 570 (7th Cir.1985); *Stap v. Chicago Aces Tennis Team, Inc.,* 63 Ill.App.3d 23, 20 Ill.Dec. 230, 379 N.E.2d 1298, 1302 (1978). The second element can be satisfied by showing that the use of the corporation carries out fraud by intentional wrongdoing or promotes injustice. *Van Dorn,* 753 F.2d at 570. The "promotion of injustice" is a lesser standard than fraud in that it does not require proof of fraudulent intent. *See id.* However, "[t]he separate corporate identities will be disregarded only if the condition claimed to be unjust to creditors is a result of the abuses of the corporate form." *See Macaluso v. Jenkins,* 95 Ill.

App.3d 461, 50 Ill.Dec. 934, 420 N.E.2d 251, 256–57 (1981).

 Both Illinois state courts and United States bankruptcy courts have held that a LLC's members can be held personally liable for acts of a LLC if similar grounds exist that have been traditionally used to pierce the veil of corporations. *See Nelsen v. Morris*, No. 03–C–7174, 2004 WL 868398, at *3 (N.D.Ill. Apr.22, 2004) ("[A]lter ego rules applicable to LLCs are generally the same as those for corporations."); *In re Sec. Investor Prot. Corp. v. R.D. Kushnir & Co.*, 274 B.R. 768, 775 (Bankr.N.D.Ill.2002);.

 As to the first element required to pierce use of the LLC business form, it is found in this case that there was such unity of interest and ownership between Kothari and Sava and RERM that the separate identities of the entity and the individuals no longer existed. It is also found that RERM was undercapitalized, that Kothari and Sava did not follow the corporate formalities, and that they did not maintain books and records on behalf of RERM. At trial, Kothari and Sava testified that RERM did not maintain a bank account at the time the Agreement was entered into. (Kothari Trial Test.; Sava Trial Test.) The supposed earnest money deposit check was drawn on a bank account titled Vasile Sava Real Estate Broker as to which Sava was as a sole proprietor. (*See* JX 14 at PT000739; Sava Trial Test.) This account contained a negative balance at the end of October 2004. (*See* PX 23 at BANKONE 0241.) In addition, although the RERM Operating Agreement, Article 7.1 required company funds to be deposited in a bank or money market account in the name of the company, (*see* JX 21 at RERM0023 ¶ 7. 1), no such account was opened until November 16, 2004. (*See* PX 23 at BANKONE 0002.) Such an account was eventually opened in order to accept deposits for a real estate development at

1000 South Michigan Avenue, that RERM was responsible for marketing and selling. (Kothari Trial Test.) Thus, it is found that RERM had no assets at the time it entered into the Agreement, and therefore it was undercapitalized for such a venture.

In addition, Kothari and Sava failed to follow the corporate formalities as required by the RERM Operating Agreement. Pursuant to the RERM Operating Agreement, Article 5. 1, Kothari was a Member of the corporate entity. *See* Findings of Fact, *supra*, ¶ 15. As such, he did not have any right to manage the company, or any authority to act on its behalf. *Id.* Sava, the Manager, had the exclusive authority to manage the company. *See id.* Nevertheless, Kothari testified that he and Sava operated the company informally through various oral agreements, and that he was authorized by Sava to enter into the Agreement. (Kothari Trial Test.; Sava Trial Test.) There was no written approval to entered into the Agreement by the Members, Kothari and Sava, as required by Article 6.1(C)(i). (*See* JX 21 at RERM0020 ¶ 6.1(C)(i).) Finally, the requirements to maintain books and records were embodied in the Operating Agreement. (*See id.* at RERM0018–19 ¶ 5.5.) However, Kothari testified that RERM did not keep such books and records. (Kothari Trial Test.) Thus, it is found that RERM did not have a corporate identity apart from Kothari and Sava, because of their failure to follow corporate formalities outlined in the RERM Operating Agreement.

 Nevertheless, Plaintiff has failed to satisfy his burden as to the second element of his alter ego claim, the sanctioning of a fraud or the promotion of injustice. Under Illinois law, piercing the corporate veil is an equitable remedy, not a cause of action. *U.S. v. All Meat and Poultry Products Stored at Lagrou Cold Storage*, 470 F.Supp.2d 823, 833 (N.D.Ill.

2007). Having failed to prove that Defendants committed any fraud, *see* discussion of Count IV, Plaintiff faces an uphill battle to show that injustice resulted from abuse of the company form.

On Friday, October 15, 2004, when Douglass informed Kothari that RERM was the successful bidder, Kothari told him that RERM was not in position to tender the earnest money deposit. *See* Findings of Fact, *supra*, ¶ 57(a)-(g). On the same day, Kothari had a conversation with Douglass and Goldstein, on behalf of the Trustee, who agreed to accept the earnest money deposit in the form of a wire transfer on Tuesday, October 19. *Id.* at ¶ 57(b). Nevertheless, Douglass and Goldstein told Kothari that they needed possession of a check to act as a "placeholder" to demonstrate to the Mortgagee that the Trustee had fulfilled the requirements of obtaining an executed agreement and "Qualifying Deposit" by October 17, as required by Exhibit C of the DRO. *Id.* at ¶ 57(c). When Kothari tendered the check to Douglass, Douglass was aware that it was not in certified funds and was drawn on an account in the name of an individual whom he had never met. *Id.* at ¶¶ 44–45. As earlier discussed, Kothari did not represent that there were sufficient funds to honor the check. This put Douglass on notice that he should conduct further inquiry as to the check, but he never even contacted the drawee bank. When it became apparent that the wire transfer was not forthcoming, the Trustee belatedly threatened to deposit the check and now argues that Kothari never told him there were insufficient funds to honor it. (*See* JX 16 at PT000835.)

Douglass is a sophisticated businessman. In his desire to secure a buyer in time to meet the foreclosure deadline, and thereby generating assets for the estate and fees for DJM, he closed his eyes to facts which should have made him (as Trustee's agent)

suspicious of Defendants' ability to perform under the Agreement. He (and therefore the Trustee) took a risk as to RERM's viability as part of the effort to delay the Mortgagee from pursuing its foreclosure remedy in state court. Thus, any harm did not arise from Defendants' abuse of the corporate form, but rather as result of the lack of due diligence by Trustee's agent, and his acceptance of risk through dealing with an entity that on its face appeared to be a shell without verifiable bona fides.

For the foregoing reasons, judgment on Counts II and III will be entered in favor of Defendants.

### Attorney Fees and Billable Costs for Prevailing Party

 Under the "American Rule", a prevailing litigant ordinarily is not entitled to recover his attorneys' fees from the loser. *Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, —— U.S. ——, ——, 127 S.Ct. 1199, 1203, 167 L.Ed.2d 178 (2007) (citations omitted). This rule can be overcome by statute or agreement between the parties. *Id.* The Agreement in this case contains a provision regarding legal fees:

> Legal Fees. In the event of a default by either party of its obligations under this Agreement, the *prevailing party* in any action or proceeding in any court in connection therewith shall be entitled to recover from such other party its costs and expenses, including reasonable legal fees and associated court costs.

(JX 13 at PT000732 ¶ 18(G).) (Emphasis supplied.) Plaintiff argues that this provision only permits the non-defaulting party to recover its attorneys' fees, that RERM defaulted on the Agreement and, therefore, only Plaintiff can recover attorneys' fees. This is a tortured reading of the plain language of this provision. When interpreting contracts, contractual provisions for attorneys' fees must be strictly

construed and the court must determine the intention of the parties with respect to the payment of fees. *Grossinger Motorcorp, Inc.,* 180 Ill.Dec. 824, 607 N.E.2d at 1348 (citing *Helland v. Helland,* 214 Ill. App.3d 275, 157 Ill.Dec. 939, 573 N.E.2d 357, 359 (1991)).

▇ A party can be considered a "prevailing party" for the purposes of awarding fees when it is successful on any significant issue in the action and achieves some benefit in the action. *Id.* (citing *Dial Manufacturing International Inc. v. McGraw–Edison Co.,* 657 F.Supp. 248, (D.Ariz.1987); *American Federal Savings & Loan Association v. McCaffrey* (1986), 107 Wash.2d 181, 728 P.2d 155, (1986); *Owen Jones & Sons, Inc. v. C.R. Lewis Co.,* 497 P.2d 312 (Alaska 1972)). In this case, Plaintiff is entitled to recover damages in Count I, and, therefore, achieved some benefit in bringing suit against RERM. On the other hand, RERM and other Defendants successfully defended against several Counts and, therefore, were successful on significant issues. At this point, it is not yet appropriate to render judgment as to attorneys' fees claimed under the Agreement given the parties' conclusory arguments in their briefs thus far regarding the contractual language. Now that the parties know what judgments will be entered on each Count, ruling on this point will be reserved so that the parties can more fully brief and argue the "prevailing party" issue.

Likewise, billable costs are generally awarded to the prevailing party in federal court litigation. Now that the parties know that there are victories on both sides they can brief that issue as well.

## CONCLUSION

Pursuant to the foregoing Findings of Fact and Conclusions of Law, a separate Judgment will be entered as follows:

A. Judgment will be entered on Count I in favor of Plaintiff–Trustee and against defendant, Real Estate Resource Management, LLC, for $150,739.71 in actual and consequential damages suffered by Plaintiff–Trustee as the result of breach of contract by that defendant, plus statutory prejudgment interest to be calculated at a rate of $20.65 per day from October 26, 2004. All other and further relief sought will be denied.

B. Judgment will be entered for defendant, Bharat Kothari, on Count II.

C. Judgment will be entered for defendant, Vasile Sava, on Count III.

D. Judgment will be entered for defendants, Bharat Kothari and Real Estate Resource Management, LLC, on Count IV.

E. Ruling as to attorneys' fees pursuant to the Agreement and issues as to billable costs will be reserved pending further briefing, such ruling to be incorporated into the Judgments as may be appropriate.